## WELLS *v.* SUPERVISORS.

1. According to the ruling of the highest court of Mississippi, the financial powers conferred by the general law upon boards of supervisors of counties in that State do not include that of borrowing money.

2. The bonds of a municipal corporation issued in payment of its subscription to the stock of a railroad company are void, unless the statute confers in express terms, or by reasonable implication, authority to issue them.

3. The laws of Mississippi bearing upon the right of the authorities of Pontotoc County to subscribe for stock in the Selma, Marion, and Memphis Railroad Company (formerly known as the Memphis, Holly Springs, Okolona, and Selma Railroad Company), stated and considered, and the conclusion reached, that the bonds issued July 1, 1877, in payment of such subscription, and reciting that they are "issued under and pursuant to an order of the board of police of said county of Pontotoc, now known as the board of supervisors of said county, made under the authority of the Constitution and laws of said State of Mississippi, authorized by a vote of the people of said county at a special election held for the purpose on the twentieth day of November, A.D. 1869," are void, there having been no authority of law to issue them.

4. *Lynde* v. *The County* (16 Wall. 6) distinguished.

ERROR to the District Court of the United States for the Northern District of Mississippi.

The facts are stated in the opinion of the court.

*Mr. George Perkins* for the plaintiff in error.

*Mr. Van H. Manning, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

On the 10th of March, 1852, the legislature of Mississippi passed an act to incorporate the Mississippi Central Railroad Company. Sects. 17 and 18 of that act are as follows: —

"SECT. 17. Be it further enacted, that the boards of police of the several counties of Madison, Holmes, Carroll, Yallabusha, Lafayette, and Marshall, together with such other counties as are adjoining or adjacent to the counties through which said railroad may pass, may for their respective counties subscribe for capital stock in said railroad, not to exceed in amount two hundred thousand dollars for any one county: *Provided, however*, that an election shall be holden in the county for and on account of which said stock is proposed to be subscribed, by the qualified electors thereof, at the regular precincts of said county, ten days' notice of the time of holding such election, and of the amount proposed to be subscribed, being first given by the board of police; and if at such election a majority of the qualified electors voting shall be in favor of such subscription, then said board shall make such subscription for and in behalf of the county for the amount specified; but if a majority of those voting shall be opposed to such subscription, the same shall not be made.

"SECT. 18. Be it further enacted, that said several boards of police, either before or after any election held as provided in the seventeenth section of this act, may direct, that whenever any tax shall be collected in their respective counties for the payment of the capital stock so subscribed by the county, which tax the several boards of police are hereby authorized to assess and collect from the taxable property or real property of the county as said board may elect; that the sheriff or tax-collector shall issue to the person paying such tax a certificate specifying the amount of tax so paid, and on account of what railroad the same is paid, which said certificate or certificates shall be transferable by indorsement; and whenever any person, either by payment of taxes as aforesaid, or by indorsement as aforesaid, shall hold a certificate or certificates, in amount equal to one or more shares of the capital stock of said railroad company, he may present the same to the treasurer of said company, who shall thereupon take up the said certificate or certificates and issue to the holder of them certificates for one or more shares of stock in said company, and such holder of said certificate

of stock shall be for such stock substituted to the right of the county as a stockholder to the number of shares named in said certificate."

On the 19th of April, and during the same session of the legislature, a supplemental act was passed, by which, if the act should be approved by a vote of the several counties through which the road might be located, a tax of five per cent on the assessed value of all lands lying within five miles, and two and one half per cent on all lying over five miles and under ten, of the road, was to be collected annually for a term of four years to aid in the construction of the road. Sect. 4 of this act is as follows : —

"SECT. 4. Be it further enacted, that whenever any sheriff or tax-collector shall collect any tax by virtue of this act, he shall give to the person or persons paying the same a certificate therefor, which certificate shall be transferable by indorsement; and whenever any person or persons, either by payment of taxes as aforesaid, or by indorsement as aforesaid, shall hold a certificate or certificates in amount equal to a share of the capital stock of said railroad company, he may present the same to the treasurer of said company, who shall thereupon take up the said certificate or certificates, and issue to the holder of them a certificate for a share of stock in said company, which certificate shall entitle such person to all the rights and privileges of a stockholder in said railroad company."

On the 23d of November, 1859, the Memphis, Holly Springs, and Mobile Railroad Company was incorporated. Sect. 7 of that act of incorporation gave authority to the board of directors " to issue, sell, negotiate, mortgage, pledge, or hypothecate the bonds or notes of the company, as well as any notes, bonds, scrip, certificates, or other property for the payment of money, or other property which said company shall or may receive as donations, or in payment of subscriptions to the capital stock of said company, or other dues thereto." Sect. 8 provided that the board of directors might require each subscriber, at the time of subscribing, or at any time thereafter, to pay a part, not exceeding ten per cent, of his subscription to the capital stock in cash, and that no further payment should be demanded

until in the opinion of the board a sufficient amount of the capital stock had been subscribed, with the means and credits of the company, to construct the road. No calls were to be made except on thirty days' notice, and the amount called for at any one time could not exceed thirty per cent to each subscriber of the amount of his subscription. Sect. 15 is as follows: —

"SECT. 15. Be it further enacted, that the sects. 17 and 18 of an act passed by the legislature of this State, and approved March 10, 1852, entitled 'An Act to incorporate the Mississippi Central Railroad Company,' regulating county subscriptions to the capital stock of said company, be, and the same are, adopted as part of this act, so far as the provisions of the same may be applicable."

By sect. 16 the company was authorized to consolidate with other railroad companies.

No organization is shown to have been perfected under this act, and, Feb. 20, 1867, another act was passed, of which the title and the only portion pertinent to this case are as follows: —

" *An Act to revive and amend an Act entitled 'An Act to incorporate the Memphis and Holly Springs and Mobile Railroad Company,' approved Nov.* 23, 1859, *and for other Purposes.*

"SECT. 1. Be it enacted by the legislature of the State of Mississippi, that the above-recited act be, and the same is hereby, revived, and that the style of said railroad company shall hereafter be known as the 'Memphis, Holly Springs, Okolona, and Selma Railroad Company;' and, as many of the original incorporators are now dead, that N. B. Forrest" [&c.] "all of the State of·Mississippi, together with those who may hereafter become stockholders, their successors, &c., shall be said corporators.

"SECT. 2. Be it further enacted, that said company shall have sixteen years in which to construct the said road, and shall commence the same in three years from and after the passage of this act."

When these several acts were passed, the Constitution of Mississippi, adopted in 1832, was in force. This constitution contained no limitation on the power of the legislature to

authorize counties to become stockholders in, or to lend their credit to, railway or other corporations. A new constitution went into effect in 1868, art. 12, sect. 14, of which is as follows: —

" The legislature shall not authorize any county, city, or town to become a stockholder in, or lend its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a special election, or regular election, to be held therein, shall assent thereto."

At a special election held for that purpose on the 20th of November, 1869, the people of the county voted a subscription to the capital stock of the Memphis, Holly Springs, Okolona, and Selma company, and on the 21st of July, 1870, the name of the company was changed by a special act of the legislature to the Selma, Marion, and Memphis Railroad Company.

On the 19th of April, 1872, a general act was passed " to authorize counties, cities, and towns to subscribe to the capital stock of railroads," which gave any county through which any railroad should pass authority to subscribe any sum to the capital stock, if two-thirds of the legal voters should give their assent in the manner specially provided for. Such subscriptions were to be paid in the twenty-year coupon bonds of the county, bearing interest at the rate of seven per cent per annum. Taxes were to be levied and collected to pay the principal and interest of these bonds as they matured; and it was further also provided " that certificates of shares in the capital stock of said companies shall be issued to all persons paying taxes for the principal and interest of said bonds, to the amount paid by them, whenever the receipts for the taxes so paid shall be equal to one or more shares of the capital stock."

Under date of July 1, 1872, the board of supervisors of Pontotoc County, which was the legal successor of the board of police, under the authority of the vote of Nov. 20, 1869, issued to the Selma, Marion, and Memphis Railroad Company coupon bonds having twenty years to run, and bearing interest, payable semi-annually, at the rate of eight per cent per annum, amounting in the aggregate to $150,000. The plaintiff being

the holder for value of a large amount of the coupons of these bonds, payable January and July, 1873, and January, 1874, which were not paid on presentation at maturity, brought this suit for their recovery. The court below gave judgment against him as on demurrer to the declaration, which presented substantially the foregoing facts, and to reverse that judgment this writ of error has been brought.

The controlling question in this case is whether there was authority in law for issuing the bonds to which the coupons sued on were attached. If there was not, it has always been held that no recovery can be had in an action on the bonds or coupons. It is also settled that unless the power to issue bonds for the payment of municipal subscriptions to the stock of railroad companies is given in express terms, or by reasonable implication, no obligation of that kind can be created.

In Mississippi, as a general rule, the boards of supervisors of counties have no other financial powers than "to levy such taxes as may be necessary to meet the demands of their respective counties," and to "direct the appropriation of the money that may come into the treasury." Code (1880), sects. 2148 and 2158; Code (1857), c. 59, sect. 4, arts. 16, 30. This, it has been held by the highest court of the State, gives no power to borrow money. In *Beaman* v. *Leake County* (42 Miss. 247), decided in 1868, the court, referring to an act then under consideration, passed in December, 1863, but which in no manner affects this case, said, "The act just referred to is the only one of a general nature empowering boards of police to borrow money, and without some such act they could not lawfully do so in their official characters." The policy of the State from its earliest history seems to have been to require municipal organizations to meet their current liabilities by current taxation; and in *Hawkins* v. *Carroll County* (50 id. 762) it was expressly declared that "the grant of power to such a body of an extraordinary character, such as is not embraced in the general scope of its duties, must be strictly construed."

Such being the general law of the State, we come to consider the special legislation on which this case depends, that is to say, sects. 17 and 18 of the act of 1852, in connection with the other provisions of the act of 1859, into which these

sections were incorporated by adoption. Undoubtedly sect. 17 authorized a subscription to the stock of the railroad company for the county, after a majority of the electors of the county had in the proper way given their consent, and it is possible, if there had been nothing more, that, under the rule of construction stated in *Lynde* v. *The County* (16 Wall. 6), the subscription might have been paid in bonds. It seems to us, however, that the provisions of sect. 18 are such as to exclude any such presumption. By that section the boards of police (supervisors) were authorized to assess and collect a tax on the taxable property or the real property of the county, at their election, "for the payment of the capital stock so subscribed." No other mode of payment was provided for. This of itself, when considered in the light of the settled policy of the State to require the current liabilities of counties to be discharged by current taxation, would seem to indicate an intention not to confer upon the counties the power of funding this kind of liability. But when it is taken in connection with the further provision of the same section, which authorizes the boards of police to direct that the railroad company issue to the tax-payers, in lieu of the county, stock to the amount of their taxes paid, the intention is even more apparent. As stock was to be issued by the company to an amount equal to the taxes paid, it would seem as though it could not have been supposed that before the tax was collected any payment of the subscription was to be made, or any stock issued, that could in any manner interfere with this privilege of the tax-payers. So, too, the company could only be required to issue stock upon and to the amount of the subscription. As the tax-payer was to be entitled to stock to the full amount of his payment, it follows that the tax must have been intended to pay the subscription, and not bonds. We are not unmindful of the fact that the language of this part of the section is such as to leave it optional with the board to give this direction or not; but it may nevertheless be referred to, as we think, to strengthen the presumption arising from the other provisions, that the subscription was not to be paid through taxation, directly or indirectly, until the money to be raised in that way had actually been collected. This statute conferred an extraordinary power

on the boards of police. It authorized them to create a new liability for their respective counties, and provided a special way of discharging that liability. The liability and the mode of discharge were provided for in the same statute. This being so, the mode prescribed is exclusive of all others.

This case differs materially from *Lynde* v. *The County,* *supra.* There the tax voted was to be levied annually during a period not exceeding ten years, and the amount for each year definitely fixed. As this was done for the purpose of building a court-house, the court very properly held the vote implied permission to borrow money to accomplish the object in anticipation of the collection of the tax, which must necessarily be delayed a considerable number of years. Here the tax was to be levied to pay the subscription, that is to say, to pay the company the amount subscribed when, by the terms of the subscription, that obligation was to be met. As the statute on its face contemplated no delay in raising the money by taxation, no implication of a power to borrow in anticipation of the tax can arise. The subscription might be made, but the money must be raised by taxation to meet it. The railroad company cannot complain; for when it received the subscription it knew, or ought to have known, from what source the money was to come to meet the payment, and it impliedly gave its consent to such delays as were necessarily incident to the mode of collection. The other provisions of the charter, as to calls on subscribers to meet their subscriptions, were not necessarily applicable to counties. Counties were to pay as they agreed, and when the tax was collected.

It may be true, as is urged, that the collection of the full amount of the subscription in a single year would be oppressive, but it by no means follows that this must necessarily have been done. These sections are to be construed in the act of 1859 precisely as they would be in that of 1852, except so far as they may have been modified by the other provisions in 1859. The original act of 1852 is to be considered in connection with the supplemental act passed a little later. Being *in pari materia,* and enacted at the same session of the legislature, they are to be taken together as one law. From the supplemental act it is apparent that the object of the legislature was

to raise money by taxation to aid in the construction of the road, and to require the company to give the tax-payers stock for the money they paid. This is entirely inconsistent with any idea of the payment of interest. As the special tax on adjoining lands was large, it was extended over a period of years. This amount was fixed, and not left to the discretion of any one. In respect to the country at large the plan adopted was different. There it was left for the people to determine for themselves how much the subscription should be, and for the county and the company to agree when it should be paid. In this way the tax might be extended over a series of years; but as stock was to be issued by the company for all payments made, it could not have been intended to tax beyond the actual amount of the subscription. Consequently, if time was given by the company to make the payment, it must be without interest.

This construction of the act is strengthened by what actually happened. The revived and amended charter was passed in 1867, and the subscription voted in 1869. When the subscription was made does not appear, but certain it is that no bonds were issued to make the payment until after the policy of the State in respect to funding this class of liabilities was changed by the act of 1872. Then, although confessedly that act did not apply to this case and its provisions were not followed, the subscription was paid by binding the tax-payers of the county to pay in the aggregate $390,000, instead of $150,000, as was voted. This we think could not be done.

It is further argued that, because the seventh section of the act of 1859 authorized the railroad company to sell any *bonds* it might receive as donations or in payment of subscriptions, the power of counties to issue bonds in payment of their subscriptions must be inferred. We cannot so understand that provision. This gave power to sell bonds if in the course of business they should get to be the property of the company, but the implied prohibition against their issue by counties still remains.

It is also said that the provision in sect. 18 for giving individual tax-payers stock for the amount of their taxes paid can not be considered as in any manner precluding an implication

of the power to issue bonds, because the same provision is found in sect. 4 of the act of 1872. There is this difference between these provisions of the two acts: in that of 1852 the railroad company is to issue the stock to the tax-payer, while that of 1872 simply says that certificates of shares shall be issued, without saying by whom. But it is not for us at this time to determine the legal effect of that part of the act of 1872. Power to issue bonds is given in express terms by that act, and stock was to be issued to all persons "paying taxes for the principal and interest of said bonds;" while in the act of 1852 the tax was to be collected "for the payment of the capital stock so subscribed," and stock was to be issued by the company to the persons holding certificates of the payment of this tax.

On the whole, we think the court below was right in holding that the issue of bonds in this case was not authorized by law. Different questions will arise -if the railroad company, or any one who has been subrogated to the rights of the company, shall attempt to enforce the payment of the original subscription by the county.

*Judgment affirmed.*