Kansas City, a Municipal Corporation, Defendant in Error, v. J. I. Case Threshing Machine Company, a Corporation, and Ellis Chadwick, Plaintiffs in Error.—87 S. W. (2d) 195.

Court en Banc, October 18, 1935.*

*NOTE: Opinion filed at May Term, 1935, July 10, 1935; motion for rehearing filed: motion overruled at September Term, October 18, 1935.

914

*McCollum, Schwind & Barnes* for plaintiffs in error.

916

*George Kingsley, Roy B. Cunningham* and *William F. Allen* for defendant in error.

HYDE, C.—This is a proceeding by writ of error to review the conviction and fine assessed against defendants for violating an ordinance of Kansas City requiring payment of an occupation tax. The case was tried *de novo* in the circuit court upon an appeal from the municipal court upon an agreed statement of facts, as follows:

"The J. I. Case Threshing Machine Company is a corporation organized under the laws of the State of Wisconsin, and as such foreign corporation is duly licensed to transact business in the State of Missouri; and now maintains and for a number of years last past has maintained within the corporate limits of Kansas City, Missouri, at 2117 Broadway, and within the territorial jurisdiction of said

Municipal Court of Kansas City, Division No. 2, an implement dealer's branch house. Said company is engaged at Racine, Wisconsin, in the manufacture and sale of farming machinery, implements and equipment, but does not manufacture any machinery or other products in Kansas City.

"Ellis Chadwick is the manager of the company's branch house located as aforesaid in Kansas City and is engaged in no other pursuit or calling except as such branch manager.

"The company through its manager, Ellis Chadwick, conducts at its said branch house in the following business: It keeps on hand therein certain farming machinery, implements and equipment in the said branch house, such as tractors, plows, cultivators, harrows, discs and threshing machines, which said machinery is sold to customers out of said branch house.

"The said company at its said branch house located as herein stated now occupies, and for more than one year last past has occupied, in connection with its said business more than fifty thousand (50,000) square feet floor space.

"The Commissioner of Licenses of Kansas City, Missouri, heretofore made demand upon defendant company through its manager, Ellis Chadwick, to pay the sum of five hundred dollars ($500.00) as a license fee as provided by Section 2 of above ordinance for 'Implement dealer's branch house occupying over 50,000 square feet of floor space in the conduct of its business.' Defendants refused to comply with said demand, whereupon Kansas City instituted prosecution under said ordinance for the violation thereof, defendants were adjudged guilty in Division 2 of the Municipal Court of Kansas City and a fine of twenty-five dollars ($25.00) was assessed against each of said defendants. Whereupon both defendants, appealed to the Circuit Court of Jackson County, Missouri. The facts herein set out are submitted for all purposes in this case, being now tried *de novo* on appeal.

"On the second day of August, 1929, this defendant, through its branch manager, Ellis Chadwick, codefendant herein, made out, upon a form provided by the commissioner of licenses of the city an affidavit of its gross annual receipts for the 12 months period ending July 1, 1928, as provided in and contemplated by said Section 3 of said ordinance, in which said affidavit the gross annual receipts of this defendant's said business for the period last aforesaid were truly shown to be sixty-two thousand, five hundred and sixty-four dollars and ninety cents ($62,564.90) and together with said affidavit tendered to said commissioner its check No. 6170 dated August 2, 1929, for the sum of thirty-one dollars and fifty cents ($31.50), being the true and just amount of said license tax based at the rate provided in said Section 3 of said ordinance. The commissioner of licenses of the city refused to receive said tender of payment of

the license tax computed as aforesaid, and refused to accept the payment of said tax, or to issue to defendant company a merchant's license; and has ever since refused to accept the payment of said tax under said Section 3 and to issue to this company a license thereunder. The defendant company is now and at all times herein mentioned has been ready and willing to pay a license tax based on its gross annual receipts of the business conducted by it as aforesaid under said Section 3.''

An ordinance of the city entitled, ''An ordinance providing for the regulation and licensing of occupations, callings and trades and fixing a penalty for the violation of the same,'' Section 2, provides that:

''Every person, firm, association or corporation in this ordinance described, and every person, firm, association or corporation engaged in any business, occupation, pursuit, profession, trade, or in keeping or maintaining any institution, establishment, article, utility or commodity, in this ordinance specified, shall procure a license therefor from the city. The fees for such licenses shall be as follows:''

The particular requirement for implement dealers is as follows:

''Implement dealer, implement dealer's branch house or branch establishment, or harness and saddlery dealer's branch house or branch establishment, occupying not more than 2,500 square feet floor space, per year .................................$ 50.00

''Occupying more than 2,500 square feet floor space and not more than 5,000 square feet floor space, per year ..............$100.00

''Occupying more than 5,000 square feet floor space and not more than 10,000 square feet floor space, per year ..............$150.00

''Occupying more than 10,000 square feet floor space and not more than 20,000 square feet floor space, per year ..............$250.00

''Occupying more than 20,000 square feet floor space and not more than 50,000 square feet floor space, per year ..............$300.00

''Occupying more than 50,000 square feet floor space, per year .........................................................$500.00.''

This section of the ordinance lists alphabetically many kinds of businesses or occupations, and provides annual fees ranging from $2.50 for automobile chauffeurs to $1000 for banks and public utilities. Section 3 of the ordinance provides for a license tax for merchants and manufacturers not included in Section 2. The material parts of this section are as follows:

''Section 3. Every wholesale or retail grocer, . . . and every other similar merchant or manufacturer, dealing in or manufacturing foodstuffs exclusively shall obtain a license and pay to the city therefor the sum of fifty cents for each thousand dollars, or fractional part thereof, of the annual gross receipts of such business.

''Every wholesale merchant and manufacturer and every retail merchant and every jobber, dealer or distributor (except as other-

wise provided in this ordinance), and every person, firm, association or corporation operating, managing, conducting or superintending any . . . (businesses listed alphabetically. Implement dealers not included) shall obtain a license for the same, and pay to the city therefor the sum of 50 cents for each $1,000.00 or fraction thereof, of the annual gross receipts of the business so operated, managed, conducted, or superintended.''

The circuit court also found defendants guilty of violating the ordinance and assessed a fine of $25 against each of them. Defendants seek to have that judgment reviewed upon this writ of error. Defendants contend that the city has no authority to levy and collect an occupation tax for revenue, under Sections 1 and 10 of Article X of the Missouri Constitution, unless such authority is granted to it by the Legislature; that Section 7596, Revised Statutes 1929, is the only such grant of power to tax the occupation of merchant or manufacturer; and that defendants' business comes within that classification. Defendants, therefore, contend that, since this statute provides for a tax in proportion to annual sales, the city can only levy and collect the license tax from them on that basis, and cannot tax them on the basis of floor space occupied. Defendants further contend that the tax on such a different basis from that of other merchants violates Section 3, Article X of the Missouri Constitution and Section 1 of the Fourteenth Amendment of the Constitution of the United States. The city, on the other hand, contends that it derives its power to frame its own charter from the Constitution; and that under the charter it has adopted (Article I, Section 1, Paragraph 57) it has the power to classify and tax defendants upon the basis of floor space occupied because it is there provided that merchants and manufacturers may be licensed, taxed and regulated and that for such purpose such businesses may be divided into different classes. All parties, therefore, concede that defendants come within the classification of merchants and manufacturers.

Section 7596, which defendants say limits the city's power to impose a license tax upon them to a tax based upon gross sales, is as follows:

''All such cities, for city and local purposes, are hereby authorized to license, tax and regulate the occupation of merchants and manufacturers, and may graduate the amount of annual license imposed upon a merchant or manufacturer in proportion to the sales made by such merchant or manufacturer during the year next preceding any fixed date.''

Under Section 7595, Revised Statutes 1929, which precedes this section, the above provision for a merchants' and manufacturers' occupation tax applies to ''all cities in this state having a population of over three hundred thousand inhabitants.'' Kansas City's population is now above that figure. For the purpose of taxation, mer-

chants are defined by Section 10075, Revised Statutes 1929, and manufacturers by Section 10112, Revised Statutes 1929. A merchant may be required to pay to a city both an *ad valorem* tax on his property (merchandise) and an occupation tax. [Monett v. Hall, 128 Mo. App. 91, 106 S. W. 579, and cases cited.] Merchants in Kansas City are required to pay such an *ad valorem* tax on their merchandise (Rev. Ordinances of Kansas City, 1928, secs. 119-122, and sec. 997, Art. XII, sec. 370, Charter), and occupation taxes also. When a city seeks to exact a license fee with a view to revenue, it is an exercise of taxing power, and not of the police power to regulate. [Viquesney v. Kansas City, 305 Mo. 488, 266 S. W. 700.] The first question for determination here, therefore, is the fundamental one of the source of the city's taxing power and control of the Legislature over that power. Since it is well settled that a municipal corporation has no powers which are not derived from and subordinate to the State, Kansas City's powers must come from either a constitutional or legislative grant. [6 R. C. L. 23, sec. 12; 19 R. C. L. 728-32, secs. 35-37; 43 C. J. 176, sec. 174; 1 McQuillin, Municipal Corporations, p. 416, sec. 145; 1 Dillon, Municipal Corporations, 88, sec. 55; see, also, secs. 98-99.]

"Prior to the adoption of the Constitution of 1875, charters of municipal corporations in Missouri were granted by the Legislature, and it was the settled law that, unless restricted by the Constitution, the General Assembly could alter, amend, or abolish city and town charters. . . . The power to grant these municipal charters was nowhere expressly granted in either the Constitutions of 1820 or 1865, but was upheld on the ground that it fell within the general grant of the legislative power, which was plenary, save where restricted by some constitutional prohibition." [Morrow v. Kansas City, 186 Mo. 675, 85 S. W. 572; McGhee v. Walsh, 249 Mo. 266, 155 S. W. 445.] The charters granted to cities under our previous Constitutions by special acts of the Legislature always specifically included taxing powers and these powers were frequently added to by other special acts giving the cities specific authority to levy other taxes for special purposes. This was in recognition of the well-established principle that the American municipality has no power to levy taxes for any purpose, except as it is granted by the State. [1 McQuillin, Municipal Corporations, p. 654, sec. 256, also secs. 255-57, Vol. 5, p. 917, secs. 2313-16, Vol. 6, p. 268, secs. 2519-20; 4 Dillon, Municipal Corporations, 2395, secs. 1375-85; 19 R. C. L. 943, sec. 242; 43 C. J. 288, sec. 306; 44 C. J. 1261, sec. 4271.] Kansas City was first incorporated by such a special act in 1853 (see Laws 1853, p. 244). By another act, in 1875, this act was amended and more extensive powers granted (see Laws 1875, pp. 196-263). Other special powers to levy taxes had been granted to it by other special

acts, as, for example, the Waterworks Act of 1873 (see Laws 1873, pp. 286-295).

Because of the evils which grew out of this almost unlimited power of the Legislature to interfere, by special act, in the local affairs of every community, the framers of the Constitution of 1875 adopted numerous limitations to establish the right of local self-government in many matters. ''The crying evil that the people of the State were laboring under at the time these provisions were introduced into the Constitution was excessive indebtedness incurred by counties and other municipalities under authority of the Legislature, to meet which oppressive taxes had to be imposed, and it was to meet this evil and remove it for the future, that these provisions were introduced into the organic law of the State. It was not sought to deprive the Legislature of the taxing power and confer it upon municipalities to any extent. On the contrary, the plenary taxing power of the General Assembly as it had theretofore been exercised is recognized as a premise of the proposed legislation. It is only the exercise of it by the Assembly that is limited and regulated by the Constitution. All taxes since the adoption of the present Constitution or before are levied and collected under and by authority of the General Assembly.'' [State ex rel. Faxon v. Owsley, 122 Mo. 68, 26 S. W. 659.]

The principal limitations imposed by the Constitution of 1875 upon the power of the Legislature over municipalities were, as follows:

Art. IV, Sec. 53. Prohibiting the passage of local or special laws (among other things):

''(2) Regulating the affairs of counties, cities; . . .

''(11) Incorporating cities, towns or villages, or changing their charters.''

Article IX, Section 7. Requiring the Legislature to provide for the organization of cities and towns in not to exceed four classes, and to provide for cities and towns existing under special laws to elect to become subject to the general laws.

Sections 16 and 17. Providing that ''any city having a population of more than one hundred thousand inhabitants may frame and adopt a charter for its own government, consistent with and subject to the Constitution and laws of the State'' and make amendments thereto.

Sections 20 to 25. Providing for similar rights for the City of St. Louis and also giving it county functions.

Article X, ''Sec. 1. The taxing power may be exercised by the General Assembly for State purposes, and by counties and other municipal corporations, under authority granted to them by the General Assembly, for county and other corporate purposes.''

''Sec. 3. Taxes may be levied and collected for public purposes only. They shall be uniform upon the same class of subjects within

922

the territorial limits of the authority levying the tax, and all taxes shall be levied and collected by general laws."

"Sec. 10. The General Assembly shall not impose taxes upon counties, cities, towns or other municipal corporations or upon the inhabitants or property thereof, for county, city, town or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes."

Sections 11 and 12. Providing limits as to rates of taxation, and proportion of indebtedness to assessed valuation.

Missouri was the pioneer State in adopting a home-rule charter provision. [Art. IX, sec. 16.] This has since been followed in a number of other states. [1 McQuillin, Municipal Corporations, p. 431, sec. 152, p. 836, sec. 341; 1 Dillon, Municipal Corporations, 110, sec. 63.] Our decisions and those of other states have not been entirely harmonious in determining what the people of a city may do, in framing a home-rule charter under such constitutional provisions, without the authority of a statute; and what control remains in the Legislature to add to, change, or take away the rights and powers provided for and exercised under such charters. It is evident that the authority granted by Section 16, Article IX, did not make the people of such cities independent of the Legislature in all matters and delegate to them legislative authority to decide all policies concerning the affairs of government to be carried on in their areas. A glance at the statutory provisions concerning municipal corporations, adopted since that time, shows that it has always been construed otherwise by the Legislature, the courts and the cities themselves. . Such statutory provisions not only provide many things which cities of the four general classifications may or may not do, but provide, likewise, many powers and limitations for cities of various sizes whether within or without those classifications. "Laws applicable to cities with one hundred thousand and less than three hundred thousand inhabitants," Article 21, Chapter 38, Revised Statutes 1929; "Laws applicable to cities with over one hundred thousand inhabitants," Article 22; "Laws applicable to cities with two hundred thousand and less than five hundred thousand inhabitants," Article 23; "Laws applicable to cities with one hundred and fifty thousand and less than five hundred thousand inhabitants," Article 24; "Laws applicable to cities with over one hundred and fifty thousand inhabitants," Article 25; "Laws applicable to cities having five hundred thousand inhabitants or over," Article 26; and "Laws applicable to cities having three hundred and fifty thousand inhabitants or over," Article 27. It was well known by the Legislature, when practically all of those provisions were passed, and by the courts, when many of them were construed and upheld, that the only cities in the State which came within their provisions were

Kansas City or St. Louis, both of which were governed by home-rule charters adopted under constitutional authority.

What, then, is the principle decisive of ·these questions? The problem has been stated as follows:

"One state cannot without the consent of the other states divide itself up into a number of independent sovereignties, and consequently a municipal corporation cannot be made a free city wholly immune from legislative control. It is an essential element of all constitutional provisions establishing the principle of municipal home rule that the constitution and general laws of the state shall continue in force within the municipalities which have framed their own charters, and that *the power of the municipality to legislate shall be confined to municipal affairs.* On the other hand, after the adoption of a home rule charter by a municipal corporation, *the Legislature cannot, even by a general law, affect the powers of the municipality with respect to matters of municipal and local concern.* It is very difficult, however, to lay down any definite and comprehensive statement of what constitutes 'municipal affairs,' and the handling of the subject by the necessarily·slow process of judicial inclusion and exclusion until some workable theory of local government can be developed has resulted in a long period of uncertainty and a multiplication of legal questions and local quarrels over what is appropriate for state, and what for municipal, regulation." [19 R. C. L. 749-50, sec. 54.] (Our italics.)

The situation has, however, been considerably cleared up in this State by two recent decisions of this Court en Banc: Siemens v. Shreeve, 317 Mo. 736, 296 S. W. 416, and State ex rel. Carpenter v. St. Louis, 318 Mo. 870, 2 S. W. (2d) 713. The latter case overrules Murnane v. St. Louis, 123 Mo. 479, 27 S. W. 711, and St. Louis v. Dorr, 145 Mo. 466, 41 S. W. 1094, 46 S. W. 976, 42 L. R. A. 686; 68 Am. St. Rep. 575, insofar as they hold that the Legislature is prohibited by Section 7 of Article IX of the Constitution from enacting laws applying to cities of certain population, without regard to the four general classifications provided for therein. They, also, both hold contrary to the ruling in St. Louis v. Bircher, 76 Mo. 431, that Section 1 of Article X does not apply to cities authorized by the Constitution to frame their own charters. Upon that proposition the Siemens case said (317 Mo. l. c. 742, 296 S. W. l. c. 417):

"When by that instrument they granted cities having a population of more than one hundred thousand inhabitants the power to frame charters for their 'own government,' they also provided Section 1 of Article X, not found in the previous Constitution of 1865, which reads as follows: 'The taxing power may be exercised by the General Assembly for state purposes, and by counties and other municipal corporations, under authority granted to them by the General Assembly, for county and other corporate purposes.'

"Evidently, therefore, when the limitation was written in Section 16 of Article IX that such charters should be 'consistent with and subject to the Constitution and laws of the State' and 'always be in harmony with and subject to the Constitution and laws of the State,' it was intended that they should be consistent with and subject to statutes of general application defining the scope of the policy of the law with reference to the all important and jealously-guarded power to tax."

Likewise, in the Carpenter case the court said (318 Mo. 893-94-95, 2 S. W. (2d) 719-20):

"Respondents boldly contend further and specifically that the sole power to *levy taxes* is derived by St. Louis from the Constitution; that the General Assembly could not delegate any taxing power to St. Louis while it might do so to other cities and to counties; that the power to establish and maintain by taxation public libraries, was already 'full and ample' under the Charter and the Constitution.

"In the solution of the exact question thus raised, it becomes necessary to reexamine the limitations upon the taxing power of the General Assembly; to determine to what extent and for what purpose it may exercise control over the city of St. Louis in respect to taxation; to see whether the proposition of respondents, if given effect, does not read out of the Constitution Section 25, Article IX, quoted above.

"Sections 1 and 10, Article X, of the Constitution are pertinent. . . .

"The constitutional grant of power to a city of a certain population to 'frame a charter for its own government,' implies that such a city may impose taxes, but it does not follow that such taxing power is unlimited, as counsel seem to contend. That is, the implication of taxing power in the city of St. Louis does involve an implied limitation of control by the General Assembly. The inherent powers of that body are restrained, not by implication but by *specific* limitations in the Constitution; by Section 10, Article X, it cannot impose taxes upon cities or the inhabitants or property thereof '*for municipal purposes.*' In that important particular the Constitution preserves to cities, counties and school districts the right of local self-government, and the courts are careful not to restrict that right by construction. Otherwise, for other purposes, the authority of the General Assembly, in that respect, is unlimited, and that applies to St. Louis as well as to other cities, counties and towns. The specification in Section 10 makes no exceptions, and nothing elsewhere in the Constitution expresses or implies further limitation of legislative authority in regard to St. Louis. If Section 25, Article IX, means anything, it means that St. Louis, in the matter of imposing taxes, is subject to the same control as other cities are."

The limited scope of cities' rights in framing home-rule charters was stated in the Siemens case, as follows (317 Mo. 740, 741, 296 S. W. 1. c. 416-417):

"A city framing its own charter under the Missouri Constitution has been declared by the highest judicial authority in the land to be in a very just sense an *imperium in imperio,* and to the prescribed extent this is true. [St. Louis v. Western Union Tel. Co., 149 U. S. 465, 1. c. 468; Dillon on Munic. Corp. (5 Ed.) 112.] A charter framed by a city for itself under direct constitutional grant of power so to do has, within the limits therein contemplated, the force and effect of one granted by an act of the Legislature when unrestrained by constitutional provision. [Morrow v. Kansas City, 186 Mo. 675.] Important restraining provisions, however, appear in clauses of Section 16 of Article IX of the Constitution of 1875, the very section that permits cities having a population of more than one hundred thousand inhabitants to frame charters for their 'own government' and under which this charter was framed, limiting the exercise of this power to the formation of such charters only as shall be 'consistent with and subject to the Constitution and laws of the State,' and shall 'always be in harmony with and subject to the Constitution and laws of the State.' Both the grant and the limitation must be given effect. If the limitation is construed to mean that the charter must be consistent with every provision of the Constitution and every law of the State then the limitation simply nullifies the grant. [Kansas City v. Oil Co., 140 Mo. 458, 1. c. 470.] On the other hand, to treat the charter as 'out of, and beyond, all legislative influence,' would be to nullify the express constitutional limitation. [State ex rel. Kansas City v. Field, 99 Mo. 352, 1. c. 355.] Either construction would be extreme and unthinkable."

In the Carpenter case, it is pointed out that the true meaning and intent of the constitutional provision for framing home-rule charters was that, as to corporate functions, the city should have a free hand in framing its charter, but that as to governmental functions, which through permission or delegation of the State, the city exercised, the State necessarily retained control. This court said:

"It is well to keep in mind that a municipal corporation may be considered in two aspects: that which relates to its corporate functions only, and that in which it discharges certain governmental functions, police powers delegated to it. [Healy v. Kansas City, 277 Mo. 1. c. 626.] Matters of purely municipal corporate concern a special charter may control, and it may not be amended by a special law, though it must be in harmony with the general law where it touches upon matters of State policy. [State ex rel. v. Police Commissioners, 80 Mo. App. 1. c. 206, cited and approved by this court in State ex rel. v. Jost, 265 Mo. 1. c. 72.]

"Besides the mere corporate functions of a city there are matters governmental in character, over which it exercises authority delegated to it, in the case of special charter by the Constitution, and by the Legislature in the case of cities organized under a general law. [Kansas City v. Oil Company, 140 Mo. 1. c. 466-67.] But many such functions are of State concern, though local in their operation, and over them the State retains control.''

It, therefore, seems that the principle upon which the decisions may be harmonized is that as to its form of organization and as to its private, local corporate functions, and the manner of exercising them, the constitutional provision grants to the people of the cities designated, part of the legislative power of the State for the purpose of determining such matters and incorporating them in their charter as they see fit, free from the control of the General Assembly. When matters of this nature are adopted in a charter, as prescribed by a Constitution, such charter provisions have the force and effect of a statute of the Legislature and can only be declared invalid for the same reason, namely, if they violate constitutional limitations or prohibitions. [Kansas City v. Marsh Oil Co., 140 Mo. 458, 41 S. W. 943.] On the other hand, in matters which are governmental functions, the State retains control and, as to such matters, the provisions of a city charter, although adopted under the constitutional provision therefor, must be and remain consistent with and subject to the statutes of the State enacted by the Legislature. [Ewing v. Hoblitzelle, 85 Mo. 64, 1. c. 76.]

It is, of course, sometimes difficult to determine the border line between governmental functions and corporate functions. It is not necessary to attempt to discuss and define such various functions here. However, certain functions have, by this court, definitely been determined governmental, the control of which remains in the State. The police power is one. A municipal corporation has no inherent police power, but derives it solely from delegation by the State. [19 R. C. L. 800, sec. 108; 43 C. J. 205, sec. 204.] ''The protection of life, liberty, and property, and the preservation of the public peace and order, in every part, division, and subdivision of the State, is a governmental duty, which devolves upon the State, and not upon its municipalities, any further than the State, in its sovereignty, may see fit to impose upon or delegate it to the municipalities.'' [State ex rel. Hawes v. Mason, 153 Mo. 23, 1. c. 43, 54 S. W. 524, 529; see, also, State ex rel. Reynolds v. Jost, 265 Mo. 51, 175 S. W. 591, Ann Cas. 1917D, 1102; Strother v. Kansas City, 283 Mo. 283, 223 S. W. 419; State ex rel. Board of Police Commissioners v. Beach, 325 Mo. 175, 28 S. W. (2d) 105.] Some of the other matters, which are purely governmental functions, are those pertaining to suffrage and elections, education, regulation of public utilities, and administration of justice. [Ewing v. Hob-

litzelle, 85 Mo. 64; State ex rel. Garner v. M. & K. Tel. Co., 189 Mo. 83, 88 S. W. 41; State ex rel. Kirkwood v. Pub. Serv. Comm., 330 Mo. 507, 50 S. W. (2d) 114; see, also, cases cited, St. Louis v. Dorr, 145 Mo. l. c. 481, 41 S. W. 1094, 46 S. W. 976.] These may be delegated to or taken away from the city in whole or in part, within the wisdom of the Legislature.

There can be no doubt that the power to tax falls within this class. It is a governmental function inherent in the State. It is argued on behalf of the city that it is not necessary for it to go to a statute for authority for every specific tax which it imposes. In a sense this is true because as said in the Carpenter case the general power to impose some kind of taxes is implied from the grant to a city of the right to frame a charter for its government. This follows of necessity because no municipal functions can be carried on without revenue from some source. That implication, however, does not justify the conclusion that the city's power to tax is not subject to the control of the Legislature. ▮ Kansas City had wide taxing powers, which had been granted to it by the Legislature, before the Constitution of 1875 was adopted. [See Legislative Charter of 1875, Laws 1875, pp. 196-263.] These powers were not abrogated by the adoption of that Constitution but were by plain implication recognized as remaining in the city. [Kansas City v. Johnson, 78 Mo. 661, l. c. 667; Rutherford v. Hamilton, 97 Mo. 543, 11 S. W. 249; State ex rel. Harrison v. Frazier, 98 Mo. 426, 11 S. W. 973; Kansas City v. Marsh Oil Co., 140 Mo. 458, 41 S. W. 943; Parker-Washington Co. v. Field (Mo.), 219 S. W. 598.] These special charter provisions were enacted by the Legislature and were "laws of the State." Therefore, any new charter continuing such taxing powers would be "consistent with . . . the laws of the State." However, the constitutional provision reads "consistent with *and subject to the* Constitution and *laws of the State,*" and the right of the Legislature to change or revoke these powers by statute of general application has been recognized in a number of cases. In St. Louis v. Meyer, 185 Mo. 583, the city arrested and fined as a peddler and hawker, in violation of the city ordinance, a farmer who was selling fruits and vegetables grown by him. Section 8861, Revised Statutes 1899, excepted from the provision concerning peddlers, the selling of agricultural and horticultural products; and this court held that the city could not make such an act an offense (even by calling a farmer a hawker instead of a peddler), saying: "The municipal corporation is powerless, by definition or otherwise, to embrace in an ordinance a class of persons as peddlers, and subject them to penalties for the violation of this ordinance, who by a general law of the State are within the exception of the terms of the statute defining a class who are in fact peddlers."

In Ex parte Tarling (Mo.), 241 S. W. 929, the city of St. Louis was held to be without authority to collect a license fee in excess of one-half of the State registration fee, because Section 7596, Revised Statutes 1919, provided "that cities, towns and villages may by ordinance levy and collect license taxes from the owner of motor vehicles residing therein, . . . but such license taxes shall not exceed one-half of the registration fee provided for herein."

In the Siemens case, this court stated that, because of the constitutional grant of power to frame a charter, the power of the city of St. Louis, under a blanket clause in its charter, to impose a tax on all occupations, professions or pursuits, whether specifically named or not, had been upheld. However, after the Legislature in 1899 passed what was Section 1900, Revised Statutes 1899, now Section 7287, Revised Statutes 1929, providing: "No municipal corporation in this State shall have the power to impose a license tax upon any business avocation, pursuit or calling, unless such business avocation, pursuit or calling is specially named as taxable in the charter of such municipal corporation, or unless such power be conferred by statute," Kansas City attempted to do what St. Louis had done. This court held that this statute "controls as against the general provision of Kansas City's charter," saying (317 Mo. l. c. 743, 296 S. W. l. c. 418):

"*It is,* in effect, *a legislative finding and declaration of policy* that unless the business avocation, pursuit or calling sought to be taxed by the municipal corporation is specially named as taxable in the charter, or unless such power is conferred by statute, the power to tax is not clearly and unambiguously delegated and, therefore, consistent with the general sound policy of the law, it cannot be exercised. We think this statute applies to all municipal corporations whether under general or special charter." [See, also, Keane v. Strodtman, 323 Mo. 161, 18 S. W. (2d) 896.]

Another example of such a limitation upon the power of the city to tax occupations, imposed by a statute enacted by the Legislature, is Section 6098, Revised Statutes 1929, prohibiting any city from levying a license fee or tax upon any person "following for a livelihood the profession or calling of minister of the Gospel, teacher, professor in a college, priest, lawyer or doctor of medicine in this State." This section was enacted in 1879. [See Laws 1879, p. 45.] Prior to this statute the authority of a city to tax, at least some of these professions, was recognized. [See City of St. Louis v. Herthel, 88 Mo. 128.] That this statute took away from every city the right to tax or license these professions, regardless of what their charter provisions authorized, we do not think has ever been questioned. [See, also, Sec. 6097, R. S. 1929, prohibiting cities from making property qualifications for office.]

Applying these principles to the present case, we find that the Legislature, soon after the adoption of the Constitution of 1875, pro-

vided a method for all cities of over three hundred thousand inhabitants to classify and tax the property of merchants and manufacturers and also to license and tax such occupation. The provisions for taxing these occupations have been carried down, without change, to Section 7596, Revised Statutes 1929. The original act embodied all the provisions for taxing both merchandise and occupation in such cities in one section, as follows:

"Section 1. For the purpose of State, county and municipal taxation, merchandise held by merchants, and the raw material, merchandise, finished products, tools, machinery, and appliances used or kept on hand by manufacturers, shall constitute a class separate and distinct by itself. And all cities in this State, having a population of over three hundred thousand inhabitants, are authorized to levy for local purposes, a less *ad valorem* rate of taxation, than that levied by them on real estate or other property for the same purpose; and said reduction may, from time to time, be arranged to apply on both or either the tax rate for payments of valid indebtedness, or the tax rate for city purposes; and all such cities, for city and local purposes, are hereby authorized to license, tax and regulate the occupation of merchants and manufacturers; and may graduate the amount of annual license imposed upon a merchant or manufacturer in proportion to the sales made by such merchant or manufacturer during the year next preceding any fixed date.

"Sec. 2. It being important that the above provision shall take effect before the expiration of the merchants' and manufacturers' licenses now in force, an emergency is deemed to exist, and this act shall take effect from and after its passage and approval.

"Sec. 3. All acts and parts of acts inconsistent or in conflict with this act are hereby repealed." [Laws of 1879, p. 141.]

In the Revision of 1879, this was divided into three sections (Secs. 6909-10-11, R. S. 1879; Secs. 7764-65-66, R. S. 1889; Secs. 9396-97-98, R. S. 1899). In the Revision of 1909 the first section, that merchants' and manufacturers' stocks and machinery should constitute a separate class from other personal property was separated from the others and made Section 11340, Revised Statutes 1909, in Chapter 117, on Taxation and Revenue (Sec. 1275, R. S. 1919, Sec. 9748, R. S. 1929). The other two sections were placed under Chapter 84, on Municipal Corporations, as Secs. 9856-57, R. S. 1909; Secs. 9005-06, R. S. 1919). It is impossible to tell from the present Section 7595 what property it refers to, without looking up the history of this legislation. The merchants' and manufacturers' occupation tax thus authorized has been held valid even upon proceeds from goods sold outside of this State, by this court (American Mfg. Co. v. St. Louis, 238 Mo. 267, 142 S. W. 297); and in the Federal Courts (American Mfg. Co. v. St. Louis (U. S. C. C. A.), 8 Fed. (2d) 447, certiorari denied 270 U. S. 660, 46 Sup. Ct. 356, 70 L. Ed. 786). The plan

provided by the Act of 1879 was put into effect by ordinances soon adopted by St. Louis, then the only city of three hundred thousand in the State (see Articles XII and XIII, Revised Ordinances, St. Louis, 1881; for prior plan see Rev. Ord. St. Louis, 1871, Art. VIII). The sales plan has been followed there ever since (see St. Louis Charter of 1911, Art. XX, and Art. XV, sec. 2; Revised Ordinances, 1926, Arts. XIX-XXX, secs. 1189-1210).

 Was not this act, as said in the Siemens case, "a legislative finding and declaration of policy" that if cities of over three hundred thousand population desired to license and tax merchants and manufacturers they should do so by the method therein prescribed: to-wit, a tax in proportion to the sales made? The act did not require such cities to levy an occupation tax and therefore the terms used are permissive rather than mandatory, but it granted the authority to license and tax these occupations in broad general terms and then followed this general authority with a statement of a specific method. It contemplated a change in the system then existing for licensing these occupations because it carried an emergency clause stating that it was necessary for it to go into effect before the expiration of the licenses then in force. Moreover, it repealed all other existing acts inconsistent therewith. "It is a general principle of (statutory) interpretation that the mention of one thing implies the exclusion of another thing; *expressio unius est exclusio alterius.*" [25 R. C. L. 981, sec. 229; 25 C. J. 220, 59 C. J. 980-86, secs. 580-83.] "Where there are, in an act, specific provisions relating to a particular subject, they must govern, in respect of that subject, as against general provisions in other parts of the statute, although the latter, standing alone, would be broad enough to include the subject to which the more particular provisions relate. [Endlich on Interpretation of Statutes 288, sec. 216; see, also, Endlich, 556-60, secs. 397-99; 2 Lewis-Sutherland Statutory Construction (2 Ed.) 916-22, secs. 491-93.] In the latter work it is said (p. 919, sec. 492):

"Where authority is given to do a particular thing, and the mode of doing it is prescribed, it is limited to be done in that mode; all other modes are excluded. Such affirmative legislation, and any other which introduces a new rule, implies a negative."

The Supreme Court of the United States has held, where an act authorized a county to create a new liability and provided a mode of discharge (tax on property), that "the mode prescribed is exclusive of all others." [Wells v. Supervisors, 102 U. S. 625, 26 L. Ed. 122; see, also, Supervisors v. United States, 4 Wall. 446; Galena v. Amy, 5 Wall. 705; Smith v. Stevens, 10 Wall. 321, 19 L. Ed. 933.] "When the Legislature attempts to make a grant of power to a municipality and the same is doubtful or uncertain, all doubts and uncertainties are resolved against the municipality;" and "powers conferred upon a municipality cannot be enlarged by liberal construc-

tion;" instead "enumeration of powers operates to exclude such as are not enumerated." [Van Eaton v. Sidney (Iowa), 231 N. W. 475; 71 A. L. R. 820, and authorities cited; St. Louis v. Dreisoerner, 243 Mo. 217, 147 S. W. 998.]

■ The words "may, must, and shall" are constantly used interchangeably in statutes and without regard to their literal meaning; and in each case are to be given that effect which is necessary to carry out the intention of the Legislature as determined by ordinary rules of construction." [59 C. J. 1081, sec. 635; 25 R. C. L. 768, sec. 12; 2 Lewis-Sutherland (2 Ed.), 1153, sec. 640; Maxwell on Interpretation of Statutes (5 Ed.) 389; Endlich on Interpretation of Statutes, 416-19, secs. 306-07.] "A mandatory construction will usually be given to the word 'may' where public interests are concerned, and the public or third persons have a claim *de jure* that the power conferred should be exercised or whenever something is directed to be done for the sake of justice or the public good. [59 C. J. 1083, sec. 635.] Of course, all of these rules of construction are auxilliary rules. "The primary rule of construction of statutes or ordinances is to ascertain and give effect to the lawmakers' intent." [Meyering v. Miller, 330 Mo. 885, 51 S. W. (2d) 65.] We, therefore must decide (with the aid of these rules) the original question of whether the Legislature intended that cities of three hundred thousand should follow the sales method of levying occupation taxes upon merchants and manufacturers.

■ This act was passed at the first session of the Legislature for revising the statutes in accordance with the new Constitution. This required much revision and many enabling acts to put provisions of the Constitution into effect. The new plan provided for cities of three hundred thousand was a comprehensive one, authorizing both a property tax on merchandise, raw material, and machinery of merchants and manufacturers; and a tax on their occupations upon the basis of the sales they made. It provided a fair and reasonable basis for an occupation tax and one which no doubt was productive of much more revenue to the cities than a system of fixed annual fees. At the same time, since it was based upon ability to pay, it was a method which would operate with less discrimination and hardship than an arbitrary license tax. These advantages, no doubt, were considered by the Legislature in adopting it. It seems, both upon reason and authority, that the proper construction of this act is that the Legislature intended that the method stated in his act for taxing such occupations should be used by such cities if they taxed such occupations. The act is, of course, permissive and not mandatory upon these cities to use all or any part of it, but if the permission to license and tax is acted upon, the sole method which the statute provides is the mandatory method. In other words, the act provides that a city of three hundred thousand may levy a tax

upon the occupation of merchant and manufacturer if it graduates the amount in proportion to the sales made by them.

This statute was adopted before Kansas City ever acted under the constitutional grant to frame a home-rule charter. It was the law for cities of three hundred thousand over forty years before Kansas City reached the three hundred thousand class. It is well settled that when a city attains that class it comes under and is governed by the laws applicable to cities of such size. The universal application of such provisions to all cities which are or may become that size, is what keeps them from being in violation of the constitutional prohibitions against special legislation. Therefore, whatever the rights of Kansas City to classify and tax the occupation of merchants and manufacturers may have originally been, since it became a city of over three hundred thousand inhabitants, it has only had authority to do so upon the basis which the Legislature had prescribed for such cities. The previous charter provisions were superseded thereby. However, the present charter of Kansas City was adopted in 1925, when Kansas City was a city of more than three hundred thousand inhabitants (324,410, census of 1920). It, therefore, could only adopt in that charter the method for taxing the occupation of merchants and manufacturers which the Legislature had provided and any provisions of its new charter are void if they conflict with the statute. The charter, however, does not provide for taxing merchants and manufacturers on a basis contrary to the provisions of Section 7596, Revised Statutes 1929. It only purports to grant authority to divide the various occupations and businesses into different classes. It is the ordinance and not the charter which in this case violates the statute, not by classifying implement dealers separately, but by imposing a tax upon such a class of merchants and manufacturers upon the basis of floor space occupied instead of in proportion to their sales. Moreover, the ordinance adopts the method prescribed by Section 7596 as the basis for licensing and taxing almost all merchants and manufacturers. Such analagous branch dealers of manufactured articles as motor vehicle agencies, tractor agencies, adding maching agencies, typewriter agencies and many others are taxed on the basis of sales by Section 3 of this very ordinance.

The city relies upon Viquensney v. Kansas City, 305 Mo. 488, 266 S. W. 700, and Automobile Gasoline Co. v. St. Louis, 326 Mo. 435, 32 S. W. (2d) 281. They do not sustain the tax which the city has levied in this case. In the former, Kansas City levied a tax of one cent per gallon, and in the latter St. Louis levied a tax of one-half cent per gallon upon all gasoline sold. Such a tax did not violate the method prescribed by Section 7596, Revised Statutes 1929, but conforms to it because it is a tax imposed "in proportion to the sales made." (The statute does not require the tax to be either in

proportion to the value or the quantity of goods sold so it would seem that either method used as a basis for the tax would comply with it.) The same thing is also true of Ex parte Asotsky v. Beach, 319 Mo. 810, 5 S. W. (2d) 22, cited and relied upon by the city. In that case a tax of twenty per cent of the retail sales price of each package of cigarettes was imposed by Kansas City. This court further pointed out the right to entirely prohibit the sale of cigarettes. The tax upheld in American Mfg. Co. v. St. Louis, 270 Mo. 40, 192 S. W. 402, 250 U. S. 459, 39 Sup. Ct. 522, 63 L. Ed. 1084, also cited by the city, was one imposed under the authority of and in conformity with the requirements of the statute. Our conclusion is that Kansas City has no authority to levy and collect a tax for revenue upon the occupation of merchants or manufacturers unless the tax is in proportion to the sales made by them. This does not mean that the city may not further classify and subdivide the general classifications of merchants and manufacturers. Under the above authorities, it may do so, but if it does, the tax imposed in each of such classes thereof, must be in proportion to their sales. It is, therefore, unnecessary to pass upon the other grounds upon which it is contended the ordinance is invalid.

The judgment is reversed.

PER CURIAM:—The foregoing opinion by HYDE, C., in Division One is hereby adopted as the opinion of the Court en Banc. All concur, except *Tipton* and *Leedy, JJ.,* who dissent.