**CITY OF HAMILTON, Missouri,**
**Appellant,**

v.

**PUBLIC WATER SUPPLY DISTRICT**
**# 2 OF CALDWELL COUNTY,**
**Respondent.**

**No. WD 45493.**

Missouri Court of Appeals,
Western District.

Jan. 26, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 1993.

Application to Transfer Denied
April 20, 1993.

J.D. Gorham, McCalley, Gorham & Bowman, Richmond, for appellant.

Donald G. Kimball, Heavner, Jarrett & Kimball, Kanss City, for respondent.

Before ULRICH, P.J., and SHANGLER and FENNER, JJ.

SHANGLER, Judge.

This action for declaratory judgment presents for adjudication the interpretation of a contract by the City of Hamilton to sell potable water to Public Water Supply District No. 2 of Caldwell County for resale to its customers. The contract was concluded in March 1969 for a term of thirty-five years. The City agreed to supply the District up to 2,000,000 gallons of potable water at a flat rate of sixty cents per thousand gallons. The contract by its terms was subject to modification.

The modification term prescribes:

That the provisions of this contract pertaining to the schedule of rates to be paid by the District for water delivered are subject to modification at the end of every Five (5) year period. Any increase or decrease in rates shall be based on a demonstrable increase or decrease in the costs of performance hereunder, but such costs shall not include increased capitalization of the City system. Other provisions of this contract may be modified or altered by mutual agreement.

In 1989 the City engaged the E.T. Archer firm to provide a rate study in advance of an anticipated sale of a million-dollar bond issue for capital improvements to the municipal waterworks to increase raw water supply. The water rate study concluded that the fiscal integrity of the system was in jeopardy because the City was unable to accumulate excess revenues after satisfying all operation and maintenance expenses. The study proposed an immediate 35% rate increase in order to establish the

fiscal stability of the utility prior to the issuance of the bonds. The study concluded also that once the bonds were sold, in order to service that indebtedness and accumulate revenue, the charges for water would need to be increased by a total of 257%.

The rate then in effect called for the District to pay the City a flat $1.07 per one thousand gallons not to exceed 2,000,000 gallons per month. This is the rate that the District continues to pay the City.

In April 1989 the electorate approved the $1,000,000 water works revenue bond issue. In May 1989 the City supplied the District with a copy of the water rate study. The ostensible purpose was to satisfy the proviso of the modification term that any increase in rates be based on a "demonstrable increase" in the cost of performance. Then, the City notified the District that there would be an increase in the charges for potable water. The rates in the notice were the same as those thereafter adopted by the City in June 1989. The municipal resolution increased all water rates to $4.10 for the first 1,000 gallons; $2.75 per 1000 for the next 9,000 gallons; $2.55 per 1000 for the next 10,000 gallons; $2.20 per 1000 for the next 30,000 gallons; and $1.80 per 1000 for all gallons over 50,000. The City billed the District according to this schedule, but the District refused to pay.

Then in July 1989, the City adopted yet another resolution which increased the rates to $6.10 for the first 1,000 gallons; $4.30 per 1000 for the next 9,000 gallons; $4.00 per 1000 for the next 11,000 gallons; $3.50 per 1000 for the next 29,000 gallons; and $3.00 per 1000 for all gallons over 50,000. The City billed the District according to this schedule, but the District refused to pay.

In July 1989, the City enacted an ordinance to authorize the issuance and sale of $870,000 worth of bonds. The ordinance included a covenant to the bondholders to "fix, establish, maintain and collect such rates, fees and charges" for the use of the waterworks as would be sufficient to operate and maintain the system and to protect the bondholders.

The District sent the City a letter that, in effect, rejected the increased rate charges. The letter gave two grounds of objection: (1) The City had raised its rates for potable water sold to the District before the City had demonstrated an "increase in the costs of performance" as required by the modification term of the contract; (2) The District was entitled to a detailed list of costs which were directly related to the City's cost to sell water to the District. The letter informed the City that the District would continue to pay the City at the rate of $1.07 per 1000 gallons until a new rate could be determined.

Thereupon the City brought a petition for declaratory judgment alleging the contract dispute and seeking declarations (1) that the water rate study was a sufficient demonstration under the contract to increase the water rates to the District; (2) that the City is authorized under the contract, and is required by Missouri law, to increase its water rates conformably with the covenants of the water revenue bond so that the charges are sufficient to pay for the costs of the operation of the water system as well as the capital improvements; (3) for judgment for water used since May 1989 at the rates adopted.

The case was tried to the court, and at the close of the City's evidence, the District moved for a directed verdict, and was sustained.[1] The City appeals from that ruling.

The City raises two points on appeal and posits them as errors in sustaining the District's "motion for directed verdict" at the close of the City's case. The City cites *In re Estate of Mapes*, 738 S.W.2d 853 (Mo. banc 1987), for the rule that, on review of a motion for directed verdict at the close of

---

1. The directed verdict function and terminology are anomalous in a case tried to the court. The motion for "directed verdict" in such a trial submits the issues to the court for decision upon the merits, and not for submissibility as in a trial to a jury. It is, in legal effect, a motion for judgment. *Brassfield v. Allwood*, 557 S.W.2d 674, 677[6, 7] (Mo.App.1977); *Wyrozynski v. Nichols*, 752 S.W.2d 433 (Mo.App.1988).

the plaintiff's case, the evidence is to be viewed in the light most favorable to the plaintiff, so that the "cause may not be withdrawn from the jury" unless the reasonable inferences which may be drawn are so strongly against the plaintiff as to leave no reasonable minds to differ. *Id.* at 855[4, 5]. The City then argues that "viewing the water rate study [and the other evidence] in the light most favorable to the City," there was a sufficient showing of demonstrable increase in the City's cost of performing its contractual duty to supply water to the District, calculated without regard to the costs of capital improvements, to avoid a directed verdict.

■ The trial, of course, was to the court and not to a jury. The cause was not "withdrawn from the jury" as in *Mapes* and so the rationale of directed verdict does not appertain. In a trial without a jury, the judge is not only the trier of the facts but also the determinant of whether the plaintiff has shown a right to relief. *Wyrozynski v. Nichols*, 752 S.W.2d 433, 435[1] (Mo.App.1988). It is for this reason that the motion for directed verdict, so apt in a jury case to differentiate the judge function as to whether the evidence is submissible from the jury function to find the facts and return a verdict under the instructions of the court, has no role or function in a trial to the court without a jury. *Id.* It is for this reason also that the "motion for directed verdict" in a case tried to the court submits the issue for decision on the merits, so that the appeal from such a ruling is from a final determination of the issues and is compassed by Rule 73.01 and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Brassfield v. Allwood*, 557 S.W.2d 674, 677[6, 7] (Mo.App.1977); *Wyrozynski v. Nichols*, 752 S.W.2d at 435.

■ Accordingly, we review not for submissibility, but under *Murphy v. Carron*, 536 S.W.2d at 30. We sustain the judgment of the trial court unless "there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Id.* at 32[1–3].

### Points on Appeal

Thus interpolated, the first point on appeal posits that the judgment is against the weight of the evidence. The second posits that the judgment rests on an erroneous declaration of law. These points, although taken up in turn, interdepend, so that neither can be adjudicated separately.

■ The judgment of the court was accompanied by findings and conclusions, among them:

> The entire [water rate study] report is made for the purpose of determining the necessary rate to charge the citizens of Hamilton if the $1,000,000 capital improvement was consummated.

> [T]he contract provision for the increase in rates requires the City to provide to the District a demonstration of its increased cost of performance *excluding any capital improvement costs.*

> The study delivered to the District does not provide for the increase in actual cost of operating the City's water system without taking into consideration capitalization of the City's system. This study does not provide any evidence to the District as to what was the increase of the cost to the City to perform under the 1969 contract.

The City argues that these determinations misinterpret the water rate study "as one dealing solely with capitalization costs" and so are, in effect, against the weight of the evidence. The City acknowledges the conclusion of the study that calls for a total rate increase of 257% in order to accommodate the debt of the new improvement, but points to Part III of the study which explains that existing expenses will require an annual 35% rate increase regardless of the issuance of any bonds. Accordingly, argues the City, the evidence shows a "demonstrable increase" in the cost of performance under the contract as to the 35% rate increase without regard to the costs of capital improvements.

The trial court found nevertheless that the rate projections of the study were based not on actual costs, but on budgeted

costs, and so a 35% increase in the cost of performance by the City under the contract was not demonstrated. It is evident from the record that the actual costs were available to the City but not used. The court found expressly that the budgeted numbers used by the City engineer to project the cost for fiscal years 1988 through 1990 were "25% higher than actual cost." The court concluded that the "entire report" was made not to demonstrate the increase to the City in the cost of performance, but "for the purpose of determining the necessary rate to charge the citizens of Hamilton if the $1,000,000 capital improvement was consummated."

Whether or not the trial court determination, that the water rate report was undertaken not to prove the cost of performance under the contract but to set a rate to reflect the capital expenditures for the improvements, is valid under the evidence, does not determine the questions posed for declaratory judgment. The petition seeks the court to determine and declare "under the facts and applicable law and a correct construction of said contract" not only that the water rate study sufficed to demonstrate the increased cost of performance, but also that the City is authorized under the contract and *required by Missouri law* to increase the water rates conformably with the covenants of the water revenue bonds and hence with the provisions of § 250.120, RSMo 1986.[2] Subsection 1 of that statute imposes a mandatory duty on a governmental entity which issues water revenue bonds to fix, charge and collect rates for the use and services of the system to finance the bonded indebtedness.[3] The bond ordinance adopted by the City

included covenants conformable to the mandate of § 250.120.1.

The trial court did not adjudicate the effect of the statute on the obligations under the contract, but responded instead with the conclusion of law: "The Bond Ordinance 870 adopted by the City was a unilateral act and cannot change the provisions in the contract for increasing rates." The premise articulated for the conclusion was simply: "A contract between two political subdivisions may not be amended by one of the parties. Mutual consent is required."

Whatever the validity of the proposition, *simpliciter*, that governmental units are as bound by their agreements as are private citizens,[4] the declaration of right sought by the City was not under the operation of the bond ordinance but of § 250.120.1. It was, in effect, whether the law superimposes the mandate of the statute upon the contract between the City and the District for water supply that the petition for declaratory judgment presents for adjudication. That issue remains undecided, and the judgment is incomplete.

In a declaratory judgment the declaratory relief entered by the trial court in judgment should be complete. All the questions of right, status or other legal relations encountered in adjudicating the controversy should be settled by a declaration of rights so as to end the uncertainty that gave rise to the proceeding. Rule 87; *Liberty v. Dealers Trans. Co.*, 343 S.W.2d 40, 43[3] (Mo. banc 1961); *Nigro v. Ashley*, 690 S.W.2d 410, 417[8] (Mo.App.1984). The effect of § 250.120.1 upon the obligations

---

**2.** The City pleadings do not aver that statute as such, or even in legal effect. Its content and bearing upon the pleaded issues were presented to the court by the City, however, in opening statement and closing argument.

**3.** The pertinent part of § 250.120.1, RSMo 1986 provides:

It shall be the mandatory duty of any city, town or village or sewer district which shall issue revenue bonds pursuant to this chapter to fix and maintain rates and make and collect charges for the use and services of the system for the benefit of which such revenue bonds were issued, sufficient to pay the cost

of maintenance and operation thereof, to pay the principal of and the interest on all revenue bonds or other obligations issued or incurred by such city, town or village or sewer district chargeable to the revenues of such system and to provide funds ample to meet all valid and reasonable requirements of the ordinance or resolution by which such revenue bonds have been issued ...

**4.** See, e.g., *Kansas City v. City of Raytown*, 421 S.W.2d 504, 510[2] (Mo. banc 1967) and *Logue v. City of Carthage*, 612 S.W.2d 148, 150[1–4] (Mo.App.1981), cited by the court.

and rights of the principals under the contract for the sale of water presents a purely legal question. Accordingly, we enter the judgment the trial court should have entered and declare the rights and duties of the parties. *Nicolai v. St. Louis,* 762 S.W.2d 423, 426[4–6] (Mo. banc 1988).

■ The contract for sale of water presented for interpretation by the declaratory judgment action was concluded between the City and the District under the auspices of § 91.050, RSMo 1986. That statute enables a city that owns a system of waterworks to

> supply water from its waterworks to other municipal corporations for their use and the use of their inhabitants, and also to persons and private corporations for use beyond the corporate limits of such city, and to enter into contracts therefor, for such time, upon such terms and under such rules and regulations as may be agreed upon by the contracting parties.

It is evident that the sale of water by a city to nonresidents is left by the statute as a matter of voluntary contract, free of official regulation. *Forest City v. City of Oregon,* 569 S.W.2d 330, 334 (Mo.App. 1978). It reflects the principle that when a municipality sells utility services to nonresidents, it "sells in purely private capacity on a purely contractual basis, and cannot be regulated as to the rates charged." *Id.*

■ A proper water supply nevertheless is the commodity most essential to the health and welfare of a population and so engages the paramount police power of the state. 3 E. YOKLEY, MUNICIPAL CORPORATIONS § 500 (1958). Exercise of the police power is a governmental function, and the control of that function remains in the state. *Tietjens v. St. Louis,* 359 Mo. 439, 222 S.W.2d 70, 73[8] (banc 1949). A city is a creature of the state and, as such, has no inherent police power. *State ex rel. Sims v. Eckhardt,* 322 S.W.2d 903, 906[2–3] (Mo.1959). Its authority to exercise such power must come from specific delegation by the state or from the grant of powers of its charter. *Kansas City v. J.I. Case Threshing Mach. Co.,* 337 Mo. 913, 87 S.W.2d 195, 198[4–9] (banc 1935). The po-

lice power cannot be hindered by contracts; the obligation of contract necessarily gives way to a proper exercise of the police power. *State ex rel. Kansas City v. Public Serv. Comm'n,* 524 S.W.2d 855, 859[3] (Mo. banc 1975); 12 McQUILLIN MUNICIPAL CORPORATIONS, § 34.69 (3rd Ed.1986).

Section 91.010, RSMo 1986, empowers a city to erect, maintain and operate waterworks, or to acquire waterworks by purchase, and to supply the inhabitants with water. Section 91.050, RSMo 1986, as noted, authorizes a city to supply water from its waterworks to other municipal corporations and persons for use beyond the corporate limits and enter into contracts for that purpose under such terms "as may be agreed upon." Article 6, § 27 of the Missouri Constitution allows a city or incorporated town or village to "sell its negotiable interest bearing revenue bonds for the purpose of paying all or part of the cost of purchasing, construction, extending or improving ... revenue producing water ... the cost of operation and maintenance and the principal and interest of the bonds to be paid solely from the revenues derived by the municipality ..." Section 250.120.1, RSMo 1986, imposes upon a city which issues revenue bonds for such purpose the mandatory obligation to set rates and collect from users of the system sufficient to maintain the system and retire the indebtedness. *See* fn. 2. It is the mediate effect of § 250.120.1 [and hence the immediate effect of the city ordinance] upon the obligations and rights of the principals concluded under the contract authorized by § 91.050 that the judgment on the petition must declare.

■ The acquisition or construction by a city of a waterworks is an exercise of public purpose. *Speas v. Kansas City,* 329 Mo. 184, 44 S.W.2d 108, 113[2–4] (1931). A municipal corporation, nevertheless, acts in dual aspects. It discharges sovereign or governmental functions, delegated police powers for which it may not be called to account. It discharges also corporate functions, proprietary and municipal for which it may be called to account as a private enterprise. *Public Serv. Comm'n v. City*

*of Kirkwood,* 319 Mo. 562, 4 S.W.2d 773, 775[2, 3] (1928); *Kansas City v. J.I. Case Threshing Mach. Co.,* 337 Mo. 913, 87 S.W.2d at 202. "Where the water system of a municipal corporation is conducted by the municipality in part for profit, even if principally used for public purposes, the municipality acts in its corporate or private capacity," and not in the exercise of the police power. *Lober v. Kansas City,* 74 S.W.2d 815, 819[6–8] (Mo.1934). Accordingly, the agreement by the City of Hamilton to supply potable water to the District for a fee is a commercial venture undertaken by the municipality in its private corporate capacity. *Lockhart v. Kansas City,* 351 Mo. 1218, 175 S.W.2d 814, 815[1, 2] (1943).

■ It follows that in the construction, operation or extension of such a municipal plant, the municipality "acts in a business, proprietary, or individual capacity rather than in a legislative or governmental capacity." 12 McQUILLIN MUNICIPAL CORPORATIONS, § 35.35 (3rd Ed.1986). That is to say, the extension of the municipal waterworks by the City of Hamilton was not an exercise of its police power. A parity of principle compels the conclusion, moreover, that an ordinance adopted by a city to make and collect charges from users of waterworks for improvements to the system financed by revenue bonds under the mandate of § 250.120.1 is not an exercise of the police power.

■ The legal operation of the Contract for Sale of Water between the City and the District is nevertheless subject to the terms of § 250.120.1, and hence to the ordinance adopted under its mandate. That section, enacted in 1951, was in effect at the time and place the contract was concluded. "It is a fundamental rule that the laws which exist at the time and place of making a contract, and at the place where it is to be performed, affecting its validity, construction, enforcement, termination and discharge, enter into and form a part of the contract as if they were expressly referred to or incorporated therein." *Sharp v. Interstate Motor Freight Sys.,* 442 S.W.2d 939, 945[6, 7] (Mo. banc 1969). The laws as

to which the parties are assumed to have contracted were those which "in their direct or necessary legal operation controlled or affected the obligations of such contract." *Connecticut Mut. Life Ins. Co. v. Cushman,* 108 U.S. 51, 65, 2 S.Ct. 236, 244, 27 L.Ed. 648 (1883). The obligation of the contract, that any increase or decrease in rates be based on demonstrable increase in the costs of performance which *shall not include increased capitalization of the City system,* was "controlled or affected" by the "necessary legal operation" of the mandate of § 250.120.1. It is a mandate that the city maintain rates and collect charges *for the use and services* of its improved water system sufficient to pay the cost of· maintenance and operation as well as to repay the revenue bonds that financed the improvement.

■ That the District has the right to the use and services of the City water system as a term of contract is not disputed. The obligation to pay a charge for the use and services that includes "increased capitalization of the City system" is a term that the law in force at the time and place entered into the contract as though actually expressed. *Sharp v. Interstate Freight Sys.,* 442 S.W.2d at 945[6, 7]; *Bowers v. Kansas City Pub. Serv. Co.,* 328 Mo. 770, 41 S.W.2d 810, 812–13[4, 5] (1931). Contrary to the sense of the conclusion of law entered by trial court in judgment, therefore, neither § 250.120.1 nor the covenant of the ordinance that enacts its mandate, impairs the obligation of contract. That is because the statute does not supervene a vested right under an existing contract, but rather enters its mandate into the contract as an original term as though already expressed. 5 McQUILLIN MUNICIPAL CORPORATIONS, §§ 19.42–43 (3rd Ed. 1986).

■ The City was entitled for another, and cognate, reason to a declaration that Missouri law required the City to increase the water rates to the District conformably with the covenants of the water revenue bonds. The reason is fundamental. A municipal corporation possesses and can exercise only those powers granted by

the legislature. Thus, where the legislature has authorized a city to exercise a power and prescribed its exercise, "the right to exercise the power given in any other manner is necessarily denied ... 'The mode in such cases constitutes the measure of the power.'" *State ex rel. Blue Springs v. McWilliams,* 335 Mo. 816, 74 S.W.2d 363, 365 (banc 1934). The power of a city to erect waterworks is granted by § 91.010. The power of a city to improve waterworks and pay for the cost by revenue bonds is granted by Article 6, § 27, 27(a) of the Missouri Constitution and § 250.100. The duty of a city to charge rates for the use and services of the system sufficient to pay the principal and interest on the revenue bonds is imposed and defined by § 250.120.1.

Section 432.070, RSMo 1986, directs that no city "shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law ..." These terms are mandatory and not merely directory. *Lodge of Ozarks, Inc. v. City of Branson,* 796 S.W.2d 646, 649[1] (Mo.App.1990). The agreement by the City as a term of contract, that the costs of its performance that determine the rates payable by the District *shall not include capitalization of the City system,* in contradiction of the mandate of extant statute was beyond the scope of its powers. It was to that extent unenforceable as a legal obligation of contract. *Needles v. Kansas City,* 371 S.W.2d 300, 307[9] (Mo.1963).

The District is a user of the municipal waterworks improvements financed by revenue bonds and so, under § 250.120.1, subject to rates fixed by the City sufficient to pay the cost and operation of the system as well as the principal and interest on the revenue bonds obligation. It is clear from the evidence that the District maintains its own water supply distribution system, so that the "use and services" that the District has of the improvements under the contract is of less than the entire "City system." What constitutes the "City system" within the terms of the Contract for Sale of Water, and particularly the *modification of contract* provision, is not determinable from the record.

We enter the declaration that the City has the authority under the terms of the Contract for Sale of Water to base an increase in the rates to be paid by the District on a demonstrable increase in the costs of performance that shall include charges sufficient to pay for the cost and maintenance of the improved City system and the principal and interest on the revenue bonds. The rates charged to the District shall be based upon the extent of the City system services that the District uses.

The cause is reversed and remanded to the trial court to determine what constitutes the "City system" and what part of the City system the District "uses" under the contract. The trial court is also directed, in a manner consistent with this opinion, to adjudicate the claim of the petition for increases in charges for water sold to the District under the contract. The trial court may receive evidence to determine these issues.

All concur.