The JUNIOR COLLEGE DISTRICT
OF ST. LOUIS, Respondent,

v.

CITY OF ST. LOUIS, Appellant.

No. SC 85583.

Supreme Court of Missouri,
En Banc.

Oct. 12, 2004.

As Modified on Denial of Rehearing
Nov. 23, 2004.

Patricia A. Hageman, Edward J. Hanlon, Mark E. Lawson, St. Louis, for appellant.

Joe D. Jacobson, Martin M. Green, Allen P. Press, Fernando Bermudez, Clayton, for respondent.

LAURA DENVIR STITH, Judge.

The Junior College District of St. Louis (the College) brought a negligence action against the city of St. Louis (the City) for damages arising out of a 1997 flood of part of the college campus caused by water escaping from the College's fire suppression water pipe running between the College and the City's water main. Under stipulated facts, the trial court found the City's water division had a duty to keep water shut-off valves owned by the College accessible, that the water division was negligent in not marking or warning where the shut-off valves were located under the paved street, and that the water division employees were negligent in not shutting off the flow of water more quickly.

This Court holds that the City water division had no common law duty to keep the shut-off valve accessible, or to assist the College in locating the valve and stopping the flow of water, because the line, shut-off valve, and stop box were part of the College's private property line rather than part of the City water line. Further, the stipulated facts do not show that the City contracted to maintain the valves or to keep them accessible, nor that the City otherwise undertook this duty. Judgment in favor of the College is reversed and the case is remanded with directions to enter judgment in favor of the City.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties tried this case to the trial court under a stipulation of facts. That stipulation shows that the College, a political subdivision of the State of Missouri, constructed its Forest Park campus in the early 1960s. The campus is located in the City, just south of Highway 40 and east of Hampton Avenue. During construction of the campus, the College installed two underground water service lines. The lines, which were wholly owned by the College, ran from the College to the City water main running down Oakland Avenue. One line was the main water supply line for the campus ("supply line"); the other, a fire suppression line ("fire line"), was located six feet away.

Then, as now, each line supplied water solely to the College. When the College installed the lines, it obtained a permit from the City to connect the two lines to the City's main and to install a "stop box," containing a shut-off valve, for each line. The shut-off valve, as its name implies, is used to shut off the flow of water to a water line. Both stop boxes were located on the College's water lines, not on the City's main itself or at the junction of the

main with the College's water lines. In fact, when originally installed, the stop boxes were located under the right-of-way at the northern edge of the campus, rather than under the paved portion of the street. Access to the stop boxes, and the valves housed within them, was by means of a manhole and manhole cover set on the right-of-way. Since the completion of construction, the City, through its water division, has sold water to the College for profit and billed the College on a quarterly basis for water supplied to the College's two lines. According to the stipulation, neither line received or needed maintenance from the time of installation until the time of the flood.

Sometime between construction and 1987, the City widened Oakland Avenue so that the stop boxes for the College's two water lines were no longer located under the right-of-way next to Oakland Avenue but instead were located below a portion of the paved street area of Oakland Avenue itself. According to the stipulation, the parties do not know whether either of the manhole covers over the two stop boxes were raised and left visible at the time of the street widening or were paved over.

In 1987, when Oakland Avenue was repaved, its grade was slightly raised. Accordingly, the height of the manhole cover over the stop box covering the College's *supply line* was raised to street level by affixing one or more steel collars to the top of the manhole. The parties do not know whether the College, the City, or a third party raised this manhole cover. But, for reasons unknown by the parties, the manhole cover over the College's *fire line*—the line that later burst—was not raised. It was paved over.

The parties agree that neither the City street department nor the City water division gave the College any notice or warning that the fire line manhole had been

paved over, nor did the City mark the location of the paved-over manhole. Neither the City nor the College made any attempt from at least 1987 until 1997 to uncover the fire line manhole. It remained buried under Oakland Avenue, not visible from the street's surface.

The manholes are located directly in front of the College. The water shut-off valves and the stop boxes to which they provide access belong to the College, and they were originally installed by the College. The location of the valves, stop boxes, and original manhole covers are shown on the College's engineering drawings for the lines. In 1997, the College kept a copy of these engineering drawings in an office located in the College's basement. No employees of the College in 1997 were immediately aware of the location of the shut-off valves or stop boxes.

On October 23, 1997, at 3:00 p.m., the College's fire line ruptured, and water began flowing out of the line and flooding the campus. It is undisputed that the break occurred in the College-owned service line, not in the City's water main to which the service line connected. Unlike the case with many residential customers, the City's agreement to supply water to the College did not include an insurance provision to maintain this line. For this reason, the parties stipulated that the College was responsible for the initial break and for the first $1,005,506.00 in damages caused in the flooding that resulted from 3:00 p.m. to 3:20 p.m. due to the initial break in the College's fire line.

At about 3:10 p.m., College maintenance employees discovered the flooding water, went to Oakland Avenue, opening the manhole covering the supply line and shut off the water flowing in that line. But, because the break was not in that line but rather in the fire line, the flooding continued. Although careful review of the College's own engineering drawings would have shown that a separate fire suppression line was in place and had its own shut-off valve, College employees could not review those drawings because the basement office in which the drawings were kept was already flooded.

The College called the City's water division and also called a private plumber to help. The City water division employees arrived at 3:25 p.m. The water division employees also had a copy of the engineering drawings, and these drawings, like those in the College's basement, showed the existence of the fire line and the placement of the stop box and valve under what had become the paved area of Oakland Avenue. Neither the City water division employees nor College employees noticed these aspects of the drawings. They closed all other valves, but did not find or close the valve to the fire line. As a result, the fire line remained open, and water flooded the campus unabated.

At 5:00 p.m., with the fire line still open and the manhole cover and stop box still undiscovered, the City water division employees were called to respond to an unrelated water main break. They took their engineering drawings with them when they left to attend to this emergency. After fixing the broken main, they returned to the campus at 6:30 p.m. The College had still been unable to discover the source of the flooding.

At about 8:00 p.m., City employees located the fire line through the use of the drawings and a flow meter provided by the City and with the assistance of the private plumber. They broke through the pavement, uncovering the hidden manhole cover, and shut off the valve at 8:30 p.m., thus ending the flooding. In total, approximately 500,000 gallons of water flooded the College's campus.

The College filed a three-count petition against the City. It argued that the City is liable for $5,825,161.00 in additional damage to the campus that the parties stipulated occurred between the time the College shut off the main water supply line valve at 3:20 p.m. and when the plumber shut off the fire line at 8:30 p.m., because the negligence of the City's water division caused those additional damages. The trial court found that the City had a duty to keep the shut-off valves or stop boxes accessible, or that it should have marked their location, and that it breached these duties. Further, it found no contributory fault on the part of the College, held the City liable for the full claimed $5,825,161.00 in damages, and awarded the College $2,434,596.30 in prejudgment interest from October 23, 1997, to June 14, 2002.[1] The City appealed to the Missouri Court of Appeals, Eastern District, which transferred the case to this Court, after opinion, due to the general interest and importance of the issues involved. *Mo. Const. art. V, sec. 10.*

## II. STANDARD OF REVIEW

Appellate review of a court-tried case is generally governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), which states, "the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Id.* at 32. When, as here, a court-tried case is submitted on stipulated facts, however, then the only question before the Court "is whether the trial court drew the proper legal conclusions from the facts stipulated." *Sheldon v. Bd. of Trs. of Police Ret. Sys.*, 779 S.W.2d 553, 554 (Mo. banc 1989). *See also, Schroeder v. Horack*, 592 S.W.2d 742, 744 (Mo. banc 1979). This Court reviews questions of law *de novo. Endicott v. Display Technologies, Inc.*, 77 S.W.3d 612, 615 (Mo. banc 2002); *Baldwin v. Dir. of Revenue*, 38 S.W.3d 401, 405 (Mo. banc 2001).

## III. LIABILITY OF CITY FOR NEGLIGENCE IN PERFORMANCE OF PROPRIETARY FUNCTION OF PROVIDING WATER

### A. Proprietary Versus Governmental Functions.

The City argues that only the City street department knew that the manhole covering the stop boxes and shut-off valves had been paved over, and this knowledge cannot be imputed to the water division. Further, it argues that regardless of such knowledge, the water division had no duty to the College under the common law to keep the stop boxes or shut-off valves accessible, to warn about their location or to train its employees how to find privately-owned stop boxes and shut-off valves, nor did it assume such a duty by ordinance or contract. It argues that the City's negligence, if any, was in paving over the manhole cover, not in any water division functions, and that the paving over of the manhole cover constitutes a condition of public property. As the College never claimed that any exception to sovereign

---

1. The College argues that prejudgment interest was properly awarded because the amount of damages was fixed in that the City stipulated that its liability, if any, was for $5,825,161.00. A party cannot stipulate to issues of law. In context, it is evident, in any event, that the City was stipulating that this was the amount of the College's losses incurred after 3:20 p.m., and that if the City were held fully liable for all of the College's damages, this would be its amount. It did not stipulate to assume liability not otherwise imposed by law.

immunity applied to its paving under sections 537.600(2) and 537.610, RSMo 1994,[2] the City argues it has no liability at all.

The College alleged that the trial court was correct in finding the City negligent because the City water division was acting in a proprietary capacity in selling water to its customers for profit; thus, sovereign immunity does not apply to it.

 Under the common law, only the State and its entities were entitled to complete sovereign immunity from all tort liability. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996). Municipal corporations traditionally have had immunity, however, for those actions they undertake as a part of the municipality's governmental functions—actions benefiting the general public. *Id. See also, State ex rel. St. Louis Hous. Auth. v. Gaertner*, 695 S.W.2d 460, 462 (Mo. banc 1985). Municipal corporations do not enjoy sovereign immunity in tort while performing proprietary functions. Proprietary functions are those actions "performed for the special benefit or profit of the municipality acting as a corporate entity." *Jungerman*, 925 S.W.2d at 204. *See also, Dallas v. City of St. Louis*, 338 S.W.2d 39, 44 (Mo.1960); *State ex rel. City of Marston v. Mann*, 921 S.W.2d 100, 102 (Mo.App. S.D.1996); *Schulz Through Schulz v. City of Brentwood*, 725 S.W.2d 157, 160 (Mo.App. E.D. 1987).

In 1978, when the legislature reinstated sovereign immunity in tort as it existed at common law, *sec.* 537.600, it created two exceptions to sovereign immunity in tort for:

> (1) Injuries directly resulting from the negligent acts or omissions of public employees arising out of the operation of motor vehicles . . . ;

> (2) Injuries caused by the condition of a public entity's property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, . . . .

*Sec.* 537.600.1. In 1985, the legislature further clarified the application of this provision to municipalities by adding section 537.600.2, which states:

> The express waiver of sovereign immunity in the instances specified in subdivisions (1) and (2) of this section are absolute waivers of sovereign immunity in all cases within such situations whether or not the public entity was functioning in a governmental or proprietary capacity and whether or not the public entity is covered ·by a liability insurance for tort.

*Sec.* 537.600.2.

In *Wollard v. City of Kansas City*, 831 S.W.2d 200 (Mo. banc 1992), this Court held that if the conduct that forms the basis of the claim pertains to a dangerous condition of public property, and so comes within the terms of section 537.600, then the previous distinctions between proprietary and governmental functions are irrelevant. The statute provides for a complete waiver of sovereign immunity, regardless whether the conduct would previously have been considered proprietary or governmental, but recovery is limited to the amount prescribed by statute. *See secs.* 537.610; 537.615, RSMo 2000.

The College does not attack *Wollard* or address its potential application to the repaving of Oakland Avenue; therefore, there is no reason for this Court to reach the question whether such repaving created a dangerous condition of public property or whether the statutory limitation on damages applies to any negligence in repaving. Rather, the College asserts that

---

**2.** All statutory references are to RSMo 1994 unless otherwise indicated.

section 537.600 and any limitations on recovery for a dangerous condition of public property are irrelevant, for it is not suing for a dangerous condition of public property, nor has it alleged it is entitled to recover from the City for improperly paving over the stop box and shut-off valve. It instead asserts fault on the City's part in its functions and capacity as a *supplier of water*.

The College argues that because the alleged negligence of the City as a supplier of water does not involve a condition of public property, section 537.600.2 is irrelevant, and the distinction between proprietary and governmental functions therefore applies to the City in its capacity as supplier of water. Therefore, the College argues, the City is liable if its supplying of water is a proprietary function and if the water division had and breached a duty either to: 1) maintain the accessibility of the fire line shut-off valve; 2) mark the location of the paved manhole cover or warn the College that it was paved over; or 3) properly train its water division employees so that they could locate the shut-off valve in a timely fashion.

The College alleged that these duties on the part of the City arose under the common law, or alternatively, that the City assumed these duties in 1993 when it passed an ordinance requiring the City to uncover paved-over manhole covers in certain circumstances, and that the City breached one or more of these duties.[3]

■ The College is correct that the limitations on liability set out in section 537.600.1 do not apply where the alleged tort does not involve a dangerous condition of public property or the operation of a motor vehicle, and that in such cases the distinction between whether a municipality is operating in a proprietary or governmental capacity is still important. Numerous cases have addressed whether a municipal water division is acting in a proprietary or governmental capacity in supplying water as a public utility. Where a city supplies water for use in putting out fires, it is performing a governmental function and is immune from liability. *See Lober v. Kansas City*, 74 S.W.2d 815, 822 (Mo.1934) (noting that "in the extinguishment of fires," a municipality acts in its governmental capacity). *See also, Theodoro v. City of Herculaneum*, 879 S.W.2d 755, 761 (Mo.App. E.D.1994) ("The creation of a municipal fire department is for the benefit of the general public, and therefore, any act or omission of the municipality associated with the performance of this service is a governmental function for which the municipality ordinarily may not be held liable."); *O'Dell v. City of Breckenridge*, 859 S.W.2d 166, 168 (Mo. App. W.D.1993) (accord). But, when a municipality is in the business of selling water to customers for profit or revenue, it is engaged in a proprietary function. *Lober*, 74 S.W.2d at 822.

■ Here, it is stipulated that "the City operates a Water Division which distributes and sells water to residential, commercial and industrial customers, including the College." The water that flooded was not being used by it to fight a fire or for another public purpose. The water was being purchased by the College to run through lines solely owned by the College and intended for use solely on its property. In supplying this water, the City was engaged in a proprietary function, and its alleged fault in regard to supplying water

---

3. Ordinance 23.04.185 states: "Notwithstanding the provision of any other ordinance, the Water Division with funds from the Water Division, shall, by contract, or otherwise, expose, make street level, and make accessible stop boxes over shut off valves whenever the City of St. Louis, by contract or otherwise, is responsible for covering said stop boxes during street repair or resurfacing." Ord. 62836 sec 1, 1993.

for use in this private line does not constitute a dangerous condition of public property, so that sovereign immunity principles do not apply.

*B. No Duty of City Water Division to Provide Access to Shut-off Valve or Warn of Lack of Access.*

■ As the College notes:

Whenever a city in its proprietary capacity operates a waterworks system for the purpose of supplying water to individuals, as is admitted in the present case, it must assume the same responsibility for its negligence as any other private supplier of water for profit, and the question of its liability for negligence must be so determined.

*Adam Hat Stores, Inc. v. Kansas City,* 316 S.W.2d 594, 597 (Mo. banc 1958).

The College poses the question, "If the City had been a private water company, would there be any question that it would be liable for the losses suffered by the College resulting from the City's bungling?" In fact, if a private water company had acted as the City water division had done, the private water company would *not* be held liable to the College. The City is not either.

■ While the College asserts otherwise, the cases it cites do not support its arguments. In each of these cases, *the water company's own lines or other company property* caused the injury. Here, however, the break did not occur in the City main, but in the College's own line, an event for which the College admits it, not the City, is responsible. Yet, the College also owns the fire line shut-off valve and stop box. None of the cited cases hold that a water company has a duty to repair, make, or keep accessible property owned by the customer, in the absence of a contract so requiring. *Adam Hat Stores,* 316 S.W.2d at 594, *Koch Brothers Bag Co. v. Kansas City,* 315 S.W.2d 743 (Mo.1958),

and *Lamar v. City of St. Louis,* 746 S.W.2d 160 (Mo.App. E.D.1988), merely hold that a water company has a duty not to let the company's property cause injury to others, and, so, is responsible where a break in the water company's lines caused damage to surrounding property. In *Byrd v. Brown,* 641 S.W.2d 163, 169 (Mo.App. S.D.1982), a duty was found only because the city itself damaged a neighbor's water pipe, which ultimately resulted in the plaintiff's store being damaged by a fire.

In an attempt to avoid this difficulty, the College argues that a common law duty on the part of the water division can also be found in principles set out in *Lopez v. Three Rivers Electric Cooperative, Inc.,* 26 S.W.3d 151 (Mo. banc 2000), and *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc./Special Products, Inc.,* 700 S.W.2d 426 (Mo. banc 1985). These cases, however, do not assist the College.

In *Lopez,* the representatives of two decedents sued defendant after a helicopter carrying the decedents crashed into defendant's unmarked power lines. This Court found that defendant, which owned the power lines, should have foreseen a probability of injury if the lines went unmarked, and that it had a duty to tag them or make them visible in some way. *Lopez,* 26 S.W.3d at 156. In that case, the duty arose because defendant owned the power lines and had a continuing duty to warn of danger resulting from their obscured location. Here, as noted, the City does not own the water line, stop box, or shut-off valve; the College owns them. Nothing in *Lopez* suggests that this Court would have held the power company liable if *the injured party* owned the power lines.

In *Hoover's Dairy,* plaintiff claimed that defendant was negligent in the installation of a milking system. During installation, defendant failed to conduct a complete system analysis. A stray voltage problem went undetected, ultimately infecting forty

percent of plaintiff's herd. *Hoover's Dairy,* 700 S.W.2d at 428–30. This Court found that defendant had a duty to warn plaintiff of the stray voltage problem at the time of installation. *Id.* at 432. Here, however, it was the College that installed the valve and stop box, not the City. *Hoover's Dairy* is not on point. Moreover, here the College alleges a duty on the part of the City to warn of a danger that did not arise until years after the stop box and valve were installed; *Hoover's Dairy* did not hold that the installers' duty to warn continued as to defects arising after the installation was complete and ownership passed to the farmer.

The College cites to no other case providing a basis for finding a common law duty on the part of the City water division to maintain open access to customer-owned shut-off valves and stop boxes or to warn customers if another division blocks access to the valve or stop box. This is separate from the issue whether the City was negligent in paving Oakland Avenue. The City acknowledges that, at some point, it paved over the manhole giving access to the shut-off valve and stop box, and it is implicit in the trial court's decision that it believed that the City was negligent in so doing. Certainly, a factual question for submission to the jury was raised by the evidence. And, the water division, as a division of the City, can be charged with knowledge of the fact that the City's street department paved over the College's stop box and shut-off valve.[4]

But, the College specifically disclaims that it is seeking damages based on the paving over of the manhole, thereby allowing it to bypass the issues whether the repaving created a dangerous condition of public property and whether the $100,0000 limitation on recovery set out in section 537.610 therefore applies. In order to do so, it attempted to plead a duty and breach on the part of the City water division separate and apart from any negligence in paving over the manhole. It was, then, required to demonstrate that such a separate duty existed, rather than merely posit that it did.

For these same reasons, the dissenting opinion is in error in suggesting that the water department somehow breached a duty to the College because of the paving over of the stop box, separate and apart from the duty of the City as a paver of the road. While the City may have had and breached a duty in paving the road, it was in its function as a paver of the road that it would have done so. If the College wishes to avoid the sovereign immunity issues thereby implicated, then it must identify a separate basis for an additional duty by the City in its capacity as a provider of water.

The cases the College and the dissent cite simply do not provide the authority for finding such a separate duty on the part of the water division, separate and apart from any liability that may have arisen from paving over the manhole. The trial court erred in finding such a common law duty on the part of the water division.

## IV. DUTY OF WATER DIVISION EMPLOYEES TO ACCURATELY LOCATE STOP BOX AND SHUT–OFF VALVE

Plaintiff asserted an alternative claim that the City had a duty to properly train

---

**4.** *See State ex rel. Bd. of Trs. of the City of N. Kansas City Mem'l Hosp. v. Russell,* 843 S.W.2d 353, 357 (Mo. banc 1992) (stating that the board of trustees of the city of North Kansas City hospital has no separate statutory existence, but is rather a part of the City, much like a city council); *Spinks v. City of St. Louis Water Div.,* 176 F.R.D. 572, 573 (E.D.Mo.1997) ("The Water Division is merely an arm of the City and lacks a separate legal identity apart from the City.").

its water division personnel to locate shut-off valves in a timely fashion and that it breached this duty. Again, the College fails to identify the source of this alleged duty. While the City has a duty to repair breaks in its own line, and the cases cited by the City will hold a municipality liable for damages caused by leaks from its own line, here, once again, all agree that the break occurred in the College's line and that the College was the one responsible for keeping that line itself in repair.[5] The College simply asserts that the City had a duty to help it find the leak and if it acted negligently in failing to do so, it can be found liable. While the City has control over the public road itself, see section 82.190, there is no allegation that it failed to permit the College access to the stop box once the College located the leak, and the College cites no contract or common law authority that the City has a duty to train its employees to assist its customers in locating leaks in a timely fashion.

The City did send its engineers to the site of the leak when the College called, and the engineers did attempt to assist the College in locating the leak, but they were unable to do so. The College asserts they were negligent in failing to notice the location of the hidden stop box and shut-off valve, which were marked on the engineering drawings.

■ As the College notes, there are situations in which a volunteer can be sued for negligence in offering assistance, for "[t]he law imposes an obligation upon everyone who attempts to do anything, even if gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken." *Hoover's Dairy*, 700 S.W.2d at 432, *citing*, 57 Am.Jur.2d *Negligence* sec. 45 (1971). In *Stanturf v. Sipes*, 447 S.W.2d 558, 561 (Mo.1969), this Court adopted Restatement (Second) of Torts section 323 (1965), which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Thus, to be held liable, a volunteer must increase the risk of harm or the harm must be suffered because the one being helped relied to his detriment on the voluntary undertaking. In the absence of such an increase in harm or detrimental reliance, the volunteer may abandon his or her assistance without liability, for the volunteer:

> [I]s not required to continue [his services] indefinitely, or even until he has done everything in his power to aid and

---

5. *See* cases cited in Part III.B. The dissenting opinion relies on a 1990 copy of the City's *Foreman's Manual,* which contains a 1980 drawing depicting the connection between the City's water main and an individual property owner's supply line, and states, "Concrete Valve Box Furnished, Installed, Owned by the Owner and *Maintained by Water Division* at Owner's Expense" (emphasis added). But, this appears to be a generic drawing, prepared years before the paving here, and contained in a manual not published until years later. In any event, the College admits it was to maintain the fire line itself, the parties agree that no maintenance was ever needed on the fire line or the valve and stop box prior to the flood, and there is no claim that the flood occurred due to lack of maintenance of the stop box, valve or line. Thus, the relevance of this drawing and statement, the author of which is unknown, is unclear.

protect the other. The actor may normally abandon his efforts at any time unless, by giving aid, he has put the other in a worse position than he was in before the actor attempted to aid him. His motives in discontinuing the services are immaterial.... He may without liability discontinue the services through mere caprice, or because of personal dislike or enmity toward the other.

*Id.,* cmt. c.

■ Here, while the water division employees voluntarily responded to the College's call for help, the College nowhere alleges facts showing that the City's decision to respond or actions in responding left the College in a worse position than it would have been in had the City not responded or that the College was placed in a worse position by relying on the City. While the City employees left the flood scene with their copy of the engineering drawings from 5:00 p.m. to 6:30 p.m. to respond to an unrelated emergency call, this did not place the College in a worse position than it would have been in had the water division employees never responded to the initial call for help. The College had its own copy of the drawings, although they were inaccessible. In any event neither the College nor the City apparently knew how to use the drawings to identify the location of the stop box. *See, e.g., Winn v. Pollard,* 62 S.W.3d 611, 616 (Mo. App. W.D.2001) (no duty existed through a gratuitous undertaking because respondent did not increase the risk of harm when he followed appellant's tractor on a highway but left before reaching the ultimate destination and appellant was rear-ended and injured by another vehicle).

Moreover, the stipulation shows that the City employees assisted the College employees and the private plumbing contractor in locating the leak and provided a flow meter. Nowhere in the stipulated facts does the College claim that it relinquished any of its options in reliance on the water division's help in locating the shut-off valve or that it delayed calling a plumber because it had called the City and that this in turn delayed stoppage of the flooding. While Restatement of Torts section 323 could apply to a suit against a municipality in its proprietary capacity if a plaintiff were able to show detrimental reliance or an increase in harm, the College simply has not proved the elements of a claim under that section by showing that any negligence of the City increased the College's harm or that its reliance on the City caused it to suffer harm it would not have suffered otherwise.

The dissenting opinion offers an alternative argument that because the water that flowed through the pipes onto College property belonged to the City, the City therefore had a duty to turn off the supply of water at the main, if not at the stop box. But, this argument proves too much, going far beyond even the College's arguments.

Indeed, if the mere fact that the water that caused the damage initially came from the City were sufficient to make the City liable if it did not timely shut off the water supply to the property, then the City would be liable for every flooded basement and water-damaged ceiling in commercial or residential properties served by City water, as would be all private water suppliers to their customers. Further, it would be liable for the flood damage that occurred before the College shut off the main water supply line at 3:20 p.m. But, the College admits that the "$1,005,506 would have been suffered regardless of the City's acts or omissions.... It was undisputed that the City bore no responsibility for this amount." There is no basis for the suggested expansion of liability.

## V. DUTY AND STANDARD OF CARE CREATED BY ORDINANCE

██ Even if no common law duty existed, the College claims that ordinance 23.04.185 placed a duty on the City to make the shut-off valve accessible. It states:

> Notwithstanding the provision of any other ordinance, the Water Division with funds from the Water Division, shall, by contract, or otherwise, expose, make street level, and make accessible stop boxes over shut off valves whenever the City of St. Louis, by contract or otherwise, is responsible for covering said stop boxes during street repair or resurfacing.

Ord. 62836 sec. 1, 1993. This ordinance was passed five years after the street department paved over the fire line manhole cover.

Here there is no question about whether the ordinance takes away some vested right of the City or imposes some external duty on it. It is the City's own ordinance that is at issue. In the ordinance, the City voluntarily undertook to state that its water division would, by contract or otherwise, expose and make street level and accessible stop boxes over shut-off valves whenever the City is responsible for covering them during street repair or resurfacing. The issue is simply the meaning of the ordinance passed by the City. The question boils down to whether the City intended by this ordinance to assume this duty on the part of its water division only as to current and future street repair and maintenance, or whether it also intended by this ordinance to undertake a duty to locate and make accessible and street level all previously paved-over stop boxes in the City.

The ordinance does not expressly state that it is retrospective or prospective in application. Focusing on the ordinance's use of the word "whenever," the College argues that ordinance 23.04.185 was intended to apply retroactively. But, the word "whenever" can be either temporal or conditional in nature. Its use is not particularly enlightening.

Focusing on the use of the words "*is* responsible for covering said stop boxes" rather than "*was* responsible for covering said stop boxes," the City argues that the ordinance clearly is applicable only to current or future repaving and repair and does not purport to require the City to examine all past repaving projects to determine whether stop boxes might have been paved over.

This Court finds the resolution of this dispute lies in considering the context in which the ordinance was passed. When the City enacted the ordinance in question, it also left in force chapter 23.12 of the St. Louis City Revised Code. That chapter contains two ordinances relating to shut-off valves. Ordinance 23.12.010 specifically places the burden on the owner to keep stop boxes accessible. Ordinance 23.12.020 states that the water commissioner has the power to excavate and shut off water if the owner does not make his or her stop box accessible or keep it in repair after notification. Ord. 48646 sec. 11 (part), 1958: 1948 C. Ch. 55 sec. 24 (part): 1960 C. sec. 551.020.

These two ordinances were last amended in 1960 and remain in effect. This suggests that an owner still has a duty to keep stop boxes and valves accessible and to pay for uncovering them when this duty is not fulfilled. Further, there is no evidence that, upon passage of the 1993 ordinance, the City undertook a program of locating and making accessible all shut-off valves and stop boxes that previously had been paved over. The City suggests that to do so would be a tremendous burden

and one it did not intend to undertake by voluntarily adopting this ordinance. While the College states that it would be good public policy for the City to make all such stop boxes and valves accessible, the issue is not what would be good public policy, but what the City in fact intended when it adopted the ordinance. Given the language used and the enormity of the undertaking that would be imposed under the College's reading of the ordinance, and the meaning contemporaneously accorded the ordinance upon its passage, an intent to voluntarily adopt such a duty cannot be read into the use of the word "whenever" in the ordinance. The ordinance is intended to be prospective-only in application.

## VI. CONCLUSION

For the reasons set out above, the trial court erred in entering judgment for the College on the theory that the City in its role as provider of water breached a duty to the College. The judgment is therefore reversed and the cause remanded for entry of judgment in favor of the City.[6]

WOLFF, PRICE and LIMBAUGH, JJ., concur.

WHITE, C.J., dissents in separate opinion filed.

TEITELMAN, J., concurs in opinion of WHITE, C.J.

RUSSELL, J., not participating.

WHITE, Chief Justice, dissenting.

I respectfully dissent. While the principal opinion correctly recognizes that the City of St. Louis (City) lacks sovereign immunity for its negligence when supplying water, the opinion errs when determining that the City has no common law duty to the Junior College District (College) for the safe provision of its water services.[1]

The City's charter provides that its water division has the special charge for the "operation and maintenance of the waterworks and of all facilities for the acquisition and distribution of water."[2] As soon as the City began acting, in its private, proprietary, corporate capacity, to construct the public water works, it entered upon an undertaking "which, in all its details, should be subordinated to the rule requiring the use of care, for the work is then ministerial."[3] This duty necessarily

---

**6.** As noted earlier, the College has specifically disclaimed any intent to recover from the City on a theory that its paving over of the stop box and valve created a dangerous condition of public property. This Court therefore does not further address whether a cause of action could have been submitted on that theory.

**1.** The City is a municipal corporation and its water division, by supplying water for a profit, was acting in a private corporate capacity eliminating sovereign immunity. *City of Hamilton v. Public Water Supply Dist. No. 2 of Caldwell County,* 849 S.W.2d 96, 102 (Mo. App.1993); *Lockhart v. Kansas City,* 351 Mo. 1218, 175 S.W.2d 814, 815(1943); *Lober v. Kansas City,* 74 S.W.2d 815, 819 (Mo.1934); *Public Serv. Comm'n v. City of Kirkwood,* 319 Mo. 562, 4 S.W.2d 773, 775 (1928); 12 McQuillin Municipal Corporations, § 35.35 (3rd Ed.1986). This distinction, between governmental and proprietary functions of municipalities, was specifically developed by the courts to impose common law liability on municipal corporations for the negligence of their agents. *Loving v. City of St. Joseph,* 753 S.W.2d 49, 51 (Mo.App.1988); *Allen v. Salina Broadcasting, Inc.,* 630 S.W.2d 225, 227 (Mo. App.1982); *State ex rel. Askew v. Kopp,* 330 S.W.2d 882, 890 (Mo.1960).

**2.** Charter of the City of St. Louis, Article XIII Board of Public Service, Section 11 Department of Public Utilities, Water Division.

**3.** *Donahew v. City of Kansas City,* 136 Mo. 657, 38 S.W. 571, 573 (1897); *St. Joseph Light & Power Co. v. Kaw Valley Tunneling, Inc.,* 589 S.W.2d 260, 267 (Mo.1979). See also section 290.210(7); *Jungerman v. City of Raytown,* 925 S.W.2d 202, 204–205 (Mo. banc 1996).

carries with it a duty to maintain the delivery system so as not to inflict injury upon private property.[4]

The principal opinion concludes that the City's duty ends with maintaining the water main itself, and that the relevant city ordinances, if ascribing any duty at all, "suggest" that it is the College's burden to maintain access to the stop-boxes, shut-off values and supply lines. However, access to the stop-box containing the shut-off value for the broken water line was denied to the College by the City's re-paving of the street, and ordinance 23.12.020 requires the City to give notice to the property owner under such circumstances—notice that the City failed to provide.[5] Moreover, the City has exclusive control over the roadway pursuant to section 82.190 absolving the College of any duty to modify the roadway to expose the stop-box without affirmative notice and without proper authorization from the City.[6]

The trial court appropriately noted that the City cannot be held liable for the violation of its own ordinances, but those ordinances can be used to determine the City's standard of care when operating its water division.[7] The City breached the standard of care in ordinance 23.12.020 when failing to provide the College with notice of its paving over the stop-box. And while ordinance 23.04.185, expressly declaring it is City's duty to make the shut-off valve accessible, does not apply retroactively from its enactment in 1993, it demonstrates scienter on the part of the City and the water division. The City was fully aware that it had been paving over stop-boxes and eliminating private access to control valves, thereby placing property owners at risk should a water pipe rupture.

The City also affirmatively declared, and subsequently breached, its duty to maintain access to the stop-box as revealed in the water division's foreman's manual (WDFM). The notation in the "elevation view" of the WDFM schematic of the College's access to the water main unequivocally states: "Concrete Valve Box Maintained by the Water Division At the Expense of the Owner." In the "plan view" of this schematic the stop-box is clearly labeled "Concrete Valve Box Purchased, Installed, Owned By The Owner And Maintained By Water Division At Owner's Expense." The water division by its own declaration had assumed the duty of care of maintaining the stop-box, and maintenance by necessity requires access.

4. The common law duty of reasonable care accompanying a municipality's proprietary provision of water has been reiterated time and time again by the courts and legal scholars. See Footnote 1; See also *Thurston v. City of St. Joseph,* 51 Mo. 510, 515–517 (Mo. 1873); Jones, Neg. Mun. Corp. 266; Dill. Mun. Corp. (4th Ed.) § 1049; Municipal Corporations by E.C. Yokley, The Miche Company Law Publishers, Virginia 1958, Section 451, pages 67–68; Section 462, pages 99–100; Section 500, page 202. *Municipal Corporations, 3d Edition by Eugene McQuillin,* Thompson/West West Group, 1997, section 49.23, pages 274–277; Section 49.30; Pages 293–304; Section 52.23, pages 380–385; Section 53.29 2003 Cum.Supp. By analogy, this is a statutory duty for all public water corporations, and violation of this duty is negli-

gence per se. See RSMo 393.130; *Martin v. Springfield City Water Co.,* 128 S.W.2d 674, 681 (Mo.App.1939).

5. The stop-box not only housed the shut-off valve that connected the College's service line to the City's water main, but it is physically located directly above this junction, and makes contact with, the City's water main. Water Division's Foreman's Manual (WDFM), dated May 15, 1990. (Legal File 42.)

6. All statutory references are to RSMo 2000 unless otherwise indicated.

7. *Bean v. City of Moberly,* 350 Mo. 975, 169 S.W.2d 393, 397 (1943); *Von Der Haar v. City of St. Louis,* 226 S.W.2d 376, 380 (Mo.App. 1950).

The fact that the stop-box itself did not require maintenance is irrelevant to the City's breach of its duty to maintain access to the instrumentality it controlled; the very instrumentality that prevented the College from stopping the flow of the City's water.[8]

While not part of the stipulated facts, it is instructive to examine some of the City's remaining ordinances that confirm it is the City who possesses the highest degree of control and maintenance over the instrumentality producing the College's damages. The City dictates the exact apparatus and/or the specifications of all of the instrumentality used to tap and control the flow of water from the City's water main. All taps, stopcocks (valves), stop-boxes (valve access boxes), service lines, meters, and meter boxes are controlled by the City, despite being owned by the property holder.[9] In fact, the fire-line that broke was an eight-inch service line making it the City's duty to install the tap, tapping valves and water meter.[10]

More telling is the City's ordinance 23.04.070 setting the standard on how repairs are to be made on service lines. The City's standard of care requires the City to shut off the water to any premises where the owner's water pipes and attachments are in disrepair or where there is an emergency impairment of the instrumentality. A broken water line is certainly one that is in disrepair and one that requires maintenance. The City breached its standard of care to shut the water off until the College brought the instrumentality back into conformity with the City's regulations. Moreover, failure to maintain access to the shut-off value created an emergency impairment to the proper control of the water.

Casting all of the City's ordinances aside, it is an inescapable fact that the City exercises total control of the primary instrumentality of its water division, namely the water itself. The principal opinion places all liability on the College based upon ownership of the service lines and concludes the City could only be liable if the City's property caused injury to the College's property. Not only did the City control the instrumentality that produced the damage to the College, the water and its delivery system, the City owned the water. More than 500,000 gallons of City water flooded the College.[11] It was the

---

**8.** The principal opinion attempts to disregard this breach of duty by stating the diagram is a generic drawing appearing not to apply to commercial customers. The opinion also asserts that the WDFM is irrelevant because the parties admit that no maintenance was required prior to the line breaking. While the City argues that there was no separate contractual arrangement for maintenance of the service lines with the College, the City argued nothing to support the supposition that it was not the City's customary practice or duty to maintain the stop-boxes and access to them for its commercial customers. Instead, the City erroneously contends the 1990 WDFM, containing the 1980's schematic where the City assumes the duty of maintenance of the stop-box, did not become applicable until after the City paved over the stop-box. The dissent does not solely rely on the WDFM to establish the City's duty as the principal opinion so mischaracterizes, but rather the dissent simply considers the totality of the evidence and combined with the City's ordinances, the WDFM serves as even more indicia of City's duty to maintain access to the shut-off valves, and the breach of the standard of care.

**9.** City Ordinances 23.04.080, 23.04.150, 23.04.180, 23.04.210, and 23.04.210–23.04.217.

**10.** City Ordinance 23.04.210.

**11.** The College sustained tremendous damage to its property as a result of a preventable, or at minimum a mitigable, flood produced by the City controlled instrumentality delivering the water and by the City's property itself—the water. The principal opinion fears that to hold the City responsible under these circumstances goes to far and would result in liabili-

City's property that damaged the College's property, and the probability or likelihood of harm under these circumstances was sufficiently serious that any ordinary person would have taken precautions to avoid it.[12]

In short, the City controlled all of the instrumentality used in delivering water to the College. The City controlled access to the stop-boxes, having exclusive control of the road pursuant to section 82.190. The City failed to provide notice to the College of its re-paving and denied the College access to the stop-box. The City declared the maintenance of the stop-box to be their own duty in the WDFM. The City controlled and owned the most basic instrumentality the water division uses for the delivery of water, the water itself. The

City could have shut off the water main and ended the flood instantly as soon as the College notified them of the leak, or immediately located the stop-box and shut off the value to the College's fire line when initially arriving on the scene. The City chose not to, and the preventable damage that resulted to the College's property was inflicted by the property of the City, the City's water.

The trial court may have improperly applied ordinance 23.04.185 retroactively to reach its result that the City breached its duty in the safe provision of water, but its conclusion was correct. When the trial court's decision is correct, even if based upon different reasoning, that decision will not be disturbed because the trial court gave a wrong or insufficient reason for it.[13]

---

ty in every instance in which commercial or residential property was flooded by the City's water. This reasoning ignores the fact that the City had to breach numerous duties prior to their water being able to reach and damage the College's property. It is the combination of the City's control of their property and its property, the water, which produced the damage. Any individual claims of liability against the water division would require a fact-specific inquiry and a comparative fault analysis— an analysis that was applied in this case when the trial court limited damages to those stipulated by the parties. Allowing *half a million gallons* of City water to flood the College is not a "mere" or trivial fact as the principal opinion so characterizes. The massive quantity of water the City allowed to flood the College demonstrates the degree of the City's negligence when the majority of the property damage could have been easily prevented. This case is not one of a flooded basement, and it is not the dissent the principal opinion targets with its response. Rather, the principal opinion appears unable, or unwilling, to trust Missouri's trial courts with the application of negligence principles and the appropriate determination of damages.

**12.** *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 156 (Mo. banc 2000).

**13.** *American Standard Ins. Co. v. Hargrave*, 34 S.W.3d 88, 92 (Mo. banc 2000). Because of

the foreseeability of the harm, a theory of general negligence supports the College's recovery. There was also a common law duty created under the theory of undertaking and reliance in two regards. First, the City engaged in the undertaking of the safe provision of water and the College was entitled to reasonably rely on the City to notify it when paving over its stop-box denying them access to the shut-off valve. *Hoover's Dairy*, 700 S.W.2d at 432; *Winn v. Pollard*, 62 S.W.3d 611, 616 (Mo.App.2001). Second, the College was also entitled to reasonably rely on the City to shut off the water once the City responded to the flood in its beginning stages— the city had multiple means of doing so once notified of the leak and negligently elected to allow the flood to continue for hours. *Id.* It is incomprehensible that the principal opinion finds the City's actions did not cause the College to suffer harm it would not have otherwise suffered once abandoning the College. The City not only elected not to employ its exclusive methods of stopping the flood, but its employees also abandoned the undertaking taking with them the only available diagram to access the shut-off valve thereby eliminating the College's only independent means of shutting off the water. The third negligence theory supporting the College's recovery is that of *res ipsa loquitor*. Contrary to the principal opinion's mischaracterization of this argument as proving too much, this is the

I would affirm the trial court's judgment.[14]

---

legal theory most commonly applied in instances where a water division acts in a proprietary manner and the municipality constructed and had exclusive control over the defective condition that produced the damages, i.e. the water and its delivery system. *Lober*, 74 S.W.2d at 819; The Law of Local Government Operations § 32.18 Pages 1058–60; Charles S. Rhyne, 1980, Wash. D.C.

**14.** By negating the College's common law negligence claim, the principal opinion potentially creates the unintended consequence of eliminating an entire class of claims that can be brought against the City's proprietary water division.